**FUJISAWA PHARMACEUTICAL CO., LTD. and Fujisawa USA, Inc., Plaintiffs,**

v.

**John N. KAPOOR, Defendant.**

No. 92 C 5508.

United States District Court, N.D. Illinois, Eastern Division.

July 25, 1996.

---

Chaim T. Kiffel, Robert J. Kopecky, Kirkland & Ellis, Chicago, IL, Jonathan Zavin, Kenneth I. Schacter, Ted Poretz, Richards & O'Neil, New York City, for plaintiffs.

George Carter Lombardi, Dan K. Webb, W. Gordon Dobie, Hurd Baruch, Michael Joseph Stepek, Hal B. Merck, Jennifer Jane Demmon, Winston & Strawn, Chicago, IL, Kathleen L. Leyden, Franczek, Sullivan, Mann, Crement, Hein, Relias, P.C., Chicago, IL, James N.O. Czaban, Bass & Ullman, P.C., New York City, for defendant.

### MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Defendant John Kapoor has moved for summary judgment on the complaint filed by the plaintiffs, Fujisawa Pharmaceutical Co., Ltd. ("Fujisawa") and Fujisawa USA, Inc. ("FUSA"), arguing that their claims are barred by the statute of limitations. For the reasons explained below, I find that the claims of securities fraud are barred by the statute of limitations and consequently enter summary judgment in favor of Kapoor on those claims. I also find that Fujisawa's RICO allegations fail to state a claim on which relief can be granted and therefore dismiss the RICO count. Finally, I decline to exercise supplemental jurisdiction over the state law claims, which are dismissed without prejudice.

### Background

Fujisawa is a Japanese Pharmaceutical company. FUSA is a Delaware corporation and a wholly-owned subsidiary of Fujisawa. Between December of 1984 and August of 1989, Fujisawa purchased stock in Lyphomed, a pharmaceutical company run by the defendant, John Kapoor.[1] Lyphomed was acquired on April 5, 1990 and merged into FUSA.

Under Kapoor's management, Lyphomed produced both proprietary and generic drugs. A proprietary drug is a new patented drug, while generic drugs are versions of patented drugs ordinarily sold after the patent on the proprietary drug expires. Before a company can manufacture and sell a generic drug, it must submit an abbreviated new drug application ("ANDA") to the Food and Drug Administration ("FDA") for approval. An ANDA contains research and development ("R & D") data demonstrating to the FDA that the proposed generic product is equivalent to the patented product being copied and is therefore safe and effective for human use. Based on the information contained in the ANDA, the FDA decides whether to allow the company to produce the generic drug.

Beginning in 1980 and continuing through 1986, Lyphomed filed false applications and information with the FDA in connection with many of its ANDAs. In addition, many Lyphomed ANDAs violated FDA rules because they contained normalized data without disclosing that fact.[2] Finally, Lyphomed failed to disclose adverse test results and failed to record, or destroyed the results of, certain tests in violation of the FDA's ANDA regulations. Fujisawa alleges that Kapoor knew or should have known that Lyphomed had committed all these violations of FDA rules.

---

1. According to the complaint, between 1978 and April 1990, Kapoor served in a variety of positions with Lyphomed including sitting on the Board of Directors and serving as Vice President, General Manager, President, Chairman of the Board, and Chief Executive Officer. Kapoor also held more than ten percent of the outstanding stock in Lyphomed.

2. Normalizing data is the process of assuming that a drug's potency is 100 percent for purposes of measuring how it degrades over time although the actual potency at the start of the test is, in fact, higher or lower than 100 percent.

In March, 1983, Lyphomed filed an initial public offering with the Securities and Exchange Commission ("SEC"). This filing did not disclose Lyphomed's ongoing FDA violations. Pursuant to an agreement dated December 3, 1984, Fujisawa purchased 450,000 shares in Lyphomed from Lyphomed and 320,000 from Kapoor. At that time, Kapoor did not disclose any information about Lyphomed's FDA violations. Fujisawa continued to purchase additional shares in Lyphomed from both Lyphomed and Kapoor in several transactions. In making these transactions, Fujisawa allegedly relied on various Form 10–Ks filed by Lyphomed and signed by Kapoor, annual reports, and other statements issued by Kapoor. None of these documents disclosed the ANDA violations. By March 1988, Fujisawa owned twenty-eight percent of Lyphomed.

During 1987 and 1988, Lyphomed was cited by the FDA as having Good Manufacturing Practices ("GMP") problems at some of its plants.[3] By the end of 1988, Lyphomed had received eight FDA Observation Reports (known as Form 483s) and an FDA regulatory letter. Form 483s list observations made by an FDA inspector during an inspection of a plant. When a company receives a Form 483, it usually submits a written response to the FDA disputing or explaining the inspector's observations, or promising to correct the problem if the company agrees that it exists. Ordinarily, if the FDA finds the company's response acceptable, the FDA will take no further action. If the FDA finds the company's response unacceptable, the FDA may take further action such as the issuance of a regulatory letter.

The regulatory letter Lyphomed received as a result of the Form 483s was serious—it informed Lyphomed that it would not be given any new approvals for generic or patented pharmaceutical products until it cured the GMP deficiencies, which it subsequently did. In response to the letter, Kapoor and

Lyphomed reassured Fujisawa and other stockholders that Lyphomed was addressing the GMP concerns. Fujisawa then bought more Lyphomed shares on the open market and, in August of 1989, Fujisawa made a tender offer for the remaining shares of Lyphomed. Lyphomed merged into FUSA on April 6, 1990.

FUSA's present problems began in February of 1991 when the FDA initiated an investigation of Lyphomed's ANDAs. In the course of that investigation, the FDA unearthed many ANDAs containing false information which had been submitted by Lyphomed between 1980 and 1986. In May, 1991, FUSA was placed on the Alert List, meaning that the FDA will not process or approve any new drug applications or any ANDAs. The FDA issued its first Form 483 in November of 1991. In response, FUSA undertook its own audit of Lyphomed's ANDAs and has withdrawn many of its products from the marketplace.

In this suit, Fujisawa and FUSA allege that Kapoor committed securities and common law fraud by failing to disclose the fact that Lyphomed had violated FDA rules and filed false information in its ANDAs. The complaint also alleges that Kapoor's many acts of fraud constitute an illegal pattern of racketeering under RICO. Finally, the complaint relies on state-law theories of constructive trust, fraud, breach of fiduciary duties, and breach of warranty. Kapoor's motion for summary judgment argues that all of the plaintiffs' claims, except the breach of warranty claim, are barred by the statute of limitations.

### The Securities Fraud Counts

The FDA investigation which uncovered the fraudulent ANDAs at issue in this case began in February, 1991.[4] This investigation differed from 1987–88 GMP inspection because this investigation focused on whether

---

**3.** These problems related to flaws in the manufacturing process for some of Lyphomed's products that had already been approved by the FDA for marketing and sale to the public.

**4.** By that time, Fujisawa had acquired Lyphomed, which became FUSA. Fujisawa and

FUSA can therefore not contest that they had knowledge of the FDA investigation and access to the Lyphomed documents relating to the filing of the ANDAs. From this point on, Fujisawa and FUSA together will be referred to simply as Fujisawa.

documents submitted to the FDA by Lyphomed contained false or misleading R & D data. Specifically, the investigation focused on ANDAs submitted while Dilip Shah worked in the R & D department of Lyphomed. Shah and a few other Lyphomed employees had left Lyphomed in March, 1985 and gone on to start their own generic drug company, called Quad Pharmaceuticals. Shah and other Quad employees were subsequently convicted of wrongdoing in their FDA interactions while at Quad, so the FDA decided to investigate Lyphomed's ANDAs to see if Shah had similarly filed false ANDAs while at Lyphomed.[5]

At the beginning of the investigation, an FDA investigator told Fujisawa that "to the best of [his] knowledge, there is no evidence that [Shah and the other people who left Lyphomed to go to Quad] falsified data at Lyphomed." (Schmidt Dep.Exh. 126) Fujisawa was not completely at ease, however, because Gary Schmidt, Fujisawa's in-house counsel, thought there was a possibility of criminal liability for Lyphomed employees and "felt that as a company [Fujisawa] should support the individuals' rights to seek their own individual lawyers ... and that the lawyer could advise the individuals of any constitutional criminal rights that an employee would be entitled to." (Schmidt Dep. at 1759)

During the investigation, Fujisawa was not kept in the dark. It assigned one of its Regulatory Affairs employees, Deepak Naik, to escort the FDA inspectors around the premises and keep track of what the inspectors were examining and finding. As Floyd Benjamin, Fujisawa's Chief Operating Officer, explained, "[w]e had regulatory affairs personnel with the FDA and pulling the same documents and identifying the issues that were being identified by [FDA Inspector John Bruederle] as they were being filed, so that report that we see in terms of efficiencies [sic] that were identified were over that whole period of time, but a lot of those items were found early on so we knew, as he knew, what was there. That's why we weren't sur-

prised that it showed up on the [November 7, 1991 Form] 483." (Benjamin Dep. Vol. III at 235) When pressed by Fujisawa's questioning, Benjamin admitted that he couldn't remember exactly when he (or Fujisawa) learned of the discrepancies found in each particular ANDA—he just knew it was sometime between February, 1991 (when the FDA investigation began) and November, 1991 (when the first Form 483 was issued). He also testified, however, that Fujisawa probably learned of each problem at the same time the FDA inspector found it "because [Fujisawa] had companion reviewers giving [it] the input based on what was found." (Benjamin Vol. III at 57)

Benjamin also testified that the problems noted in the November, 1991 Form 483 "were not new items. To [Fujisawa] these things had been identified earlier in the inspection. These were not things that just leaped out from February to November. A lot of these things were found in the first month or two of [FDA Inspector Bruederle's] review, so [Fujisawa] had had these items, [Fujisawa] knew about them." (Benjamin Dep. Vol. I at 216) In fact, in April, 1991, Benjamin made a presentation to Takashi Aoki, the Chairman of the Board and Chief Executive Officer of FUSA, in which Benjamin explained that the FDA's investigation "may provide debarment evidence" which could preclude Fujisawa from participating in pharmaceutical activities.

On April 4, 1991, FDA Inspector Bruederle issued a Form 483 for the drug Phytonadione. The Form 483 states that "[s]ignificant product development data is not documented on status reports, development reports or other written records" and "negative data has been ignored and has not been reported in submissions to the ANDAs. Available records do not include justification for not reporting this data." Fujisawa submitted a response to the FDA, challenging those observations. Fujisawa argued that Inspector Bruederle had looked at data which had never been submitted to the

---

5. The investigation was spurred by Congressman John Dingell, the Chairman of the Subcommittee on Oversight and Investigations, who explained that "[t]he individuals who founded Quad Phar-

maceuticals and falsified the Quad applications to the FDA learned their trade at LyphoMed." (Benjamin Dep.Exh. 36)

FDA. Fujisawa contended that the Phytonadione ANDA therefore did not contain false or misleading information, as alleged in the Form 483. Although Fujisawa asserts that the FDA accepted its defense, Fujisawa points to nothing in the record showing that the FDA has done so.[6]

When the FDA placed Fujisawa on the Alert List in May, 1991, the FDA provided three reasons. First, the FDA noted a problem in Lyphomed's ANDA for Succinylcholine Chloride. Second, the FDA was worried about Shah's activities at Quad and his tenure at Lyphomed. Finally, the FDA noted that Dr. Kapoor had asserted his Fifth Amendment right in refusing to testify before a Congressional subcommittee.

By May, 1991, Fujisawa had itself noticed a discrepancy in the ANDA for Glucagon. A pre-ANDA Audit Report performed on one Glucagon ANDA in May, 1991 found that "data which were out of specification were excluded from stability reports [and s]ome data points [were] missing."[7] A similar finding was made at the same time for another Glucagon ANDA. Fujisawa asked the FDA to disregard the misleading data noted by Fujisawa and supplied replacement information to support the two Glucagon ANDAs.

On July 15, 1991, Fujisawa received a letter from the Chicago District Office of the FDA explaining that it would recommend that the ANDAs for Sterile Bacitracin and Phytonadione not be approved. The letter repeated the problems noted in Phytonadione's April, 1991 Form 483 and noted "[p]roblems in the assay/methodology" for Sterile Bacitracin. On August 7, 1991, the FDA issued a Form 483 for Sterile Bacitra-

cin noting "no explanation for the selective submission of data to the application."

Finally, by August 9, 1991, Fujisawa knew that the Dopamine ANDA (one of the ANDAs on which this suit is predicated) contained normalized stability test results. As the notes of Schmidt (Fujisawa's in-house counsel) from that day explain, Fujisawa had discovered that several lots of Dopamine had been "adjusted." Fujisawa concedes that those problems identified in the Dopamine ANDA by August 9, 1991 are the exact problems Fujisawa now complains that Kapoor did not disclose.

In sum, by August 9, 1991, Fujisawa knew the following facts: (1) the FDA was investigating Fujisawa for false data submissions because Shah and other Lyphomed employees had left Lyphomed and gone on to Quad where they submitted false data to the FDA; (2) the FDA had issued a Form 483 for the Phytonadione ANDA accusing Lyphomed of excluding negative data, and the Chicago FDA office had recommended that the ANDA for Phytonadione not be approved; (3) Lyphomed had been placed on the Alert List and therefore could have no ANDAs approved; (4) two separate ANDAs for Glucagon contained stability reports from which out-of-specification data had been excluded; (5) the FDA had issued a Form 483 for Sterile Bacitracin noting "no explanation for the selective submission of data to the application;" and (6) the Dopamine ANDA which Lyphomed had submitted to the FDA contained normalized stability test results.

■ Fujisawa's claim under Rule 10b–5 is governed by a one-year statute of limitations. *Lampf, Pleva, Lipkind, Prupis & Petigrow*

---

6. As support for this contention, Fujisawa cites to two things. First, Fujisawa cites to "Response ¶ 149." Its response to ¶ 149 says simply that Fujisawa denies the statement in ¶ 149 and cites to its response to ¶ 148, which addresses a different drug. Second, Fujisawa cites the deposition testimony of Fakrul Sayeed (whom Fujisawa does not identify). When asked whether the Phytonadione application was withdrawn due to the observations in the Form 483, Sayeed simply responded, "I don't believe so. They may have been withdrawn for business, but not because of discrepancies." (Sayeed Dep. at 112–13) The Phytonadione ANDA, which was withdrawn by Fujisawa, may indeed have been withdrawn only

"for business" reasons, but that does not demonstrate that the FDA "accepted [Fujisawa's] defense."

7. Fujisawa states that this finding "refers to [Fujisawa's] inability to locate certain data points" and cites the report itself and the deposition testimony of Don Baker, Fujisawa's director of Regulatory Affairs, in support of that proposition. Baker, however, did not give this explanation for the problem in his deposition (at least not in the portion cited by Fujisawa). Consequently, because it is not supported by the record, I disregard Fujisawa's explanation.

*v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The doctrine of inquiry notice applies to this claim. *Tregenza v. Great American Communications Co.,* 12 F.3d 717, 722 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994). Under the doctrine of inquiry notice, the statute of limitations does "not await [Fujisawa's] leisurely discovery of the full details of the alleged scheme." *DeBruyne v. Equitable Life Assur. Soc. of the U.S.,* 920 F.2d 457, 466 (7th Cir.1990) (quoted case omitted). Instead Fujisawa must file suit within one year of discovery of the facts constituting fraud or within a year after reasonable diligence would have uncovered those facts. *Id.* Because Fujisawa's complaint was filed on August 16, 1992, it is time-barred if Fujisawa was on inquiry notice prior to August 16, 1991.

Fujisawa alleges that Kapoor committed securities fraud by failing to "disclose to Fujisawa his knowledge that Lyphomed had filed with the FDA certain ANDAs which contained false data." (Complaint ¶ 39) "The false data submitted by Lyphomed included data from which tests were 'normalized,' data which was incomplete or incorrect, data which failed to include adverse test results, and test results which were not recorded or were destroyed." (Complaint ¶ 24) According to Fujisawa, Kapoor "misled Plaintiffs into believing that Lyphomed had done nothing to violate applicable FDA rules" by not telling it that Lyphomed had filed "ANDAs containing false data." (Complaint ¶ 50) Fujisawa asserts that "Kapoor owed [it] a duty to disclose that Lyphomed had filed certain ANDAs containing false data with the FDA, and had violated certain FDA rules in the course of testing for and the submission of certain ANDAs." (Complaint ¶ 56)

■ Based on these allegations, it is clear that Fujisawa was on inquiry notice of its claim that Kapoor had committed the alleged securities fraud by August 9, 1991. By that date, Fujisawa knew that Lyphomed had submitted at least one ANDA, for Dopamine, which "contain[ed] false data" because it included "normalized" data. (See Complaint ¶¶ 24, 39) Fujisawa therefore also knew that Lyphomed "had violated certain FDA rules in the course of testing for and the submission of certain ANDAs" (See Complaint ¶ 56) when it adjusted or normalized several lots of Dopamine.[8] Fujisawa obviously also knew that Kapoor had not disclosed these facts. The only connection left for Fujisawa to make was whether Kapoor, the former CEO of Lyphomed, knew or should have known about the FDA infractions. Thus Fujisawa had enough information to be on inquiry notice that Kapoor had violated Rule 10b–5 by failing to disclose the FDA violations.

In addition to the Dopamine problems, Fujisawa knew of problems with several other drugs: Phytonadione, Glucagon, and Sterile Bacitracin. Fujisawa offers several explanations for why the problems with these drugs did not establish that Lyphomed had submitted false data to the FDA. For example, Fujisawa contends that its May discovery that the Glucagon ANDAs had excluded out-of-specification data "simply refers to [Fujisawa's] inability to locate certain data points." In support of this contention, Fujisawa cites to the two quoted pre-ANDA audits (each two handwritten pages) and three pages of handwritten and basically illegible notes. Fujisawa does not provide a page cite for its contention or otherwise explain how this document shows that the quoted statement from the report does not mean what it says. I am unable to find any evidence of this explanation in the documents cited by Fujisawa. Without a proper citation to any evidence in the record, I reject Fujisawa's contention. *Cf. United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Fujisawa itself apparently recognized the problem with the Glucagon data because it asked the FDA to disregard it and consider other data instead to support the Glucagon ANDAs. Thus the preparers of the Glucagon ANDAs "had violated FDA rules" (See Complaint ¶ 56), and Fujisawa knew it.

With respect to Phytonadione, Fujisawa contends that it challenged the April, 1991 Form 483 accusing Lyphomed of excluding negative data and that "the FDA accepted

8. In fact, the Dopamine ANDA is one of the ANDAs about which Fujisawa now sues.

[its] defense of the application." As discussed earlier, however, Fujisawa does not support this assertion with any evidence in the record. *See supra* n. 3. Thus Fujisawa knew that an investigator from the FDA had found problems with the Phytonadione ANDA and the Chicago District Office agreed with that investigator.[9] That information was sufficient to require Fujisawa to dig further.

Fujisawa is "put on inquiry notice when there are 'storm warnings' that would alert a reasonable investigator to the possibility of fraudulent statements or omissions in his securities transaction." *Tregenza v. Great American Communications Co.*, 823 F.Supp. 1409, 1415 (N.D.Ill.), *aff'd*, 12 F.3d 717 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994). Here, Fujisawa knew of at least three instances in which Lyphomed had submitted (or been accused of submitting) false data to the FDA. These problems are precisely what Kapoor is alleged to have withheld from Fujisawa. A "reasonable investigator" therefore would have suspected Kapoor of committing securities fraud sometime between May and August 9, 1991. Because this complaint was not filed until August 16, 1991, it is untimely.

Fujisawa makes several arguments why its claim is not time-barred. It first argues that "the existence of a government investigation, without more, is insufficient to place a plaintiff on inquiry notice of a securities fraud claim." Even if this statement accurately represents the law in this circuit,[10] I am not holding that the FDA's investigation alone put Fujisawa on notice of its claim against Kapoor. The FDA had not only been investigating Lyphomed by August 9, 1991, but had actually uncovered the very discrepancies that parallel the allegations in Fujisawa's complaint. It is the FDA's *findings* (and Fujisawa's own audit findings), of which Fujisawa admits it had knowledge, that should have alerted Fujisawa to Kapoor's alleged securities fraud.

Fujisawa also argues that because the FDA investigation involved only ANDAs filed prior to March, 1985 (when Shah left the company), Fujisawa should not be held to know the extent of Lyphomed's fraudulent filings. There are two answers to this argument. First, Fujisawa's complaint lists thirty-five ANDAs for which it seeks damages because it had to withdraw them, allegedly due to Lyphomed's false FDA filings. Of these thirty-five ANDAs, sixteen were originally submitted prior to March, 1985. It borders on the frivolous for Fujisawa to contend that it could not have known that Kapoor had committed securities fraud by looking solely at the pre–1985 ANDAs. Second, as I stated earlier, it is not the FDA investigation itself that should have put Fujisawa on notice, but rather what was uncovered during the course of that investigation. Consequently, the "focus" of the investigation did not preclude Fujisawa from acting reasonably to uncover Kapoor's alleged securities fraud once the FDA found false filings.

Fujisawa also argues that the FDA investigation did not put Fujisawa on notice of its claim against Kapoor because when the FDA began investigating Lyphomed it told Fujisawa that it had no evidence that fraud had occurred at Lyphomed. Fujisawa contends additionally that the FDA's "fraud specialist" left Lyphomed without any findings of false or misleading data in its ANDAs. The FDA's initial statement in February, 1991 and the fraud specialist's findings in approximately March, 1991, however, do not absolve Fujisawa of its responsibility to consider the false filings uncovered later by the FDA. Whether false FDA submissions by Lyphomed had yet been uncovered in the spring of 1991 does not matter. By August 9, 1991, Fujisawa knew of the problems with Lyphomed's filings related to Dopamine, Phytonadione, and Glucagon. That knowledge, as a matter of law, put Fujisawa, at a minimum, on inquiry notice of its securities fraud claim against Kapoor.

---

9. Fujisawa did not say either in its own statement of material facts or in its response to Kapoor's statement of material facts that the observations noted in the Form 483 were not factually correct.

10. None of the cases cited by Fujisawa for this proposition is a Seventh Circuit case.

Fujisawa also contends that the problems with the Dopamine ANDA "did not signify a 'practice' of data falsification to [Fujisawa], nor did it initially signify fraud to the FDA." [11] (Fujisawa's Opp.Mem. at 32) With respect to Fujisawa's first contention, Fujisawa's complaint does not allege a "practice" of data falsification—it alleges simply that Kapoor committed securities fraud when he failed "to disclose that Lyphomed had filed certain ANDAs containing false data with the FDA, and had violated certain FDA rules in the course of testing for and the submission of certain ANDAs." (Complaint ¶ 56). Consequently, whether Fujisawa knew of a "practice" on the part of Lyphomed to submit false data is not this court's inquiry. With respect to Fujisawa's second contention, whether the Dopamine ANDAs "signif[ied] fraud to the FDA" again is not my inquiry. Fujisawa is suing Kapoor for *securities fraud*, not fraud on the FDA. Consequently, whether Lyphomed defrauded the FDA and whether the FDA knew or thought it had been defrauded by Lyphomed are not relevant to whether Kapoor defrauded Fujisawa when he sold it his Lyphomed stock. Fujisawa fundamentally misunderstands the nature of its own claim against Kapoor. It is suing Kapoor for securities fraud, not food and drug "fraud."

For the same reason, Fujisawa's citation to *Robertson v. Seidman & Seidman*, 609 F.2d 583 (2d Cir.1979), is unavailing. In *Robertson*, the SEC conducted an investigation into an alleged scheme of securities fraud. The plaintiff assisted the SEC with this investigation and eventually intervened in a civil action against the underwriters and marketmakers connected with the scheme. *Id.* at 586. A year later the SEC issued an opinion stating that certain accountants, the defendants in *Robertson*, were also involved in the fraudulent scheme. *Id.* at 587. The plaintiff

thereafter filed his suit against those accountants. The defendants argued that the suit was barred by the statute of limitations because plaintiff knew about the fraudulent scheme several years earlier and with reasonable diligence could have discovered the accountants' part in it. The court held that it could not find, as a matter of law, that the plaintiffs should have known of the accountants' participation in the fraud earlier. *Id.* at 592–93.

Fujisawa quotes from the opinion: "If the SEC with its commendable expertise and specialized investigative teams was unable to discover the complicity of these accountants until shortly before its Opinion and Order ... was released, it cannot be said as a matter of law that appellant should have discovered their participation any earlier." 609 F.2d at 592. Fujisawa fails to recognize, however, the different roles of the SEC and the FDA. The SEC was investigating the scheme in *Robertson* for securities fraud. Thus the court concluded that the plaintiff should not be required to be more adept at unearthing securities fraud than the SEC. In contrast, here the FDA was investigating Lyphomed only for food and drug "fraud." It was not looking for the securities fraud upon which this claim is based. Thus whether the FDA thinks it has been defrauded or how long the FDA's investigation took is not relevant to when Fujisawa was on inquiry notice that Kapoor had committed securities fraud.

In sum, I find as a matter of law that Fujisawa knew, at least by August 9, 1991, that Lyphomed had submitted false data and violated FDA rules in preparing its ANDAs. There is no genuine issue of material fact whether Fujisawa knew by August 9, 1991 that Lyphomed had normalized data for the Dopamine ANDA. Even if Fujisawa were not sure whether it could explain away the

---

**11.** Fujisawa also maintains that FDA Inspector Bruederle, after reviewing the Dopamine ANDA, "specifically advised [Fujisawa] that he did not intend to issue a Form 483; that is, he made no observation serious enough to warrant one." (Fujisawa's Stmt. Material Facts at 147) Fujisawa's only support in the record for this contention is a memo written by Naik summarizing Bruederle's investigation. Naik wrote: "I asked John if he was planning to issue 483 citations at the end of investigation [sic] related to Dilip Shah and others who left Lyphomed. John told me that if he finds anything otherwise he would do exactly like what they did after [the fraud specialist's] investigation." (Naik Inspection Memos at Bates No. A0159949) Not only does this memo fail to mention Dopamine, but nowhere does it say that Bruederle did not find the Dopamine problem serious enough to issue a Form 483.

Dopamine problems, it was not allowed to sit back and wait to see if the FDA took further action before deciding whether to sue Kapoor. Once Fujisawa knew facts supporting the existence of the very omission alleged in the complaint, the statute of limitations began to run. Because this suit was not filed until August 16, 1992, Fujisawa's claim under Rule 10b–5 is time-barred.

Fujisawa's claim under § 18 must also be brought "within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued." 15 U.S.C. § 78r(c). Because Fujisawa was on inquiry notice of Kapoor's alleged fraud prior to August 16, 1991, the § 18 claim is also barred.[12]

### The RICO Claim

In Count IV of its Second Amended Complaint, Fujisawa alleges a violation by Kapoor of RICO, 18 U.S.C. § 1962(c). This Court, having the benefit of the Seventh Circuit's decision in *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516 (7th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 916, 133 L.Ed.2d 846 (1996), has decided to reevaluate whether Fujisawa has stated a valid RICO claim.[13]

■ To state a claim for a violation of section 1962(c), Fujisawa must allege conduct of an enterprise through a pattern of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). To satisfy the pattern requirement, Fujisawa must fulfill the "continuity plus relationship" test by showing two or more predicate acts that are related to one another and pose a threat of continued criminal activity. *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir.1992)

(citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989)). Fujisawa alleges that various acts of mail fraud committed by Kapoor supply the requisite predicate acts. I must therefore determine how many of acts of mail fraud Fujisawa has adequately alleged.[14]

■ A RICO allegation of mail fraud requires the plaintiff to plead (1) that the defendant has participated in a scheme to defraud and (2) that the defendant has mailed or knowingly caused to be mailed a letter or other material for the purpose of executing the fraudulent scheme. *McDonald v. Schencker*, 18 F.3d 491, 494 (7th Cir.1994). Here Fujisawa satisfies the first element, because it alleges that Kapoor engaged in a fraudulent scheme by inducing Fujisawa to purchase Lyphomed without telling Fujisawa about the deficient ANDAs. Under these allegations, Kapoor committed a separate act of mail fraud each time he caused a Lyphomed annual report or other material to be mailed to Fujisawa, if those documents helped him to perpetrate the alleged scheme. Fujisawa's complaint mentions letters attached to Form 10–K's, annual reports attached to Form 10–K's, and the 10–K's themselves for the years 1983 through 1988, so assuming each 10–K was mailed (and not just directly filed with the SEC), Kapoor would have committed six acts of mail fraud under the complaint's allegations.

■ Under the allegations of the complaint, these six acts of mail fraud satisfy the relationship prong of the RICO pattern test, because each act of mail fraud relates to Kapoor's scheme to induce Fujisawa to purchase Lyphomed by concealing Lyphomed's FDA violations. The continuity requirement

---

12. Fujisawa's claim for a violation of § 12(2) of the Securities Act, 15 U.S.C. § 77l(2) would also be barred by the statute of limitations. *See* 15 U.S.C. § 77m. Fujisawa, however, has conceded that the Court's decision in *Gustafson v. Alloyd Co.*, —— U.S. ——, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), precludes Fujisawa from stating a claim for a violation of that section. Accordingly, the Section 12(2) claim will be dismissed.

13. I am not bound by "the law of the case" to allow the RICO claim to stand. *See Champaign–*

*Urbana News Agency, Inc. v. J.L. Cummins News Co., Inc.*, 632 F.2d 680, 683 (7th Cir.1980) (holding that a judge to whom a case is transferred is not precluded by the "law of the case" doctrine from coming to a different conclusion from that of the first judge on the same facts).

14. Fujisawa's original complaint also contained allegations of wire fraud that were stricken for failing to comply with Rule 9(b). Fujisawa subsequently removed those allegations in its Second Amended Complaint.

presents a tougher burden for Fujisawa, especially since Kapoor's alleged scheme has ended—Fujisawa now owns Lyphomed. Because the alleged scheme has ended; Fujisawa must demonstrate that Kapoor's wrongful conduct "endur[ed] a 'substantial period of time' ... [so that it] carries with it an implicit threat of continued criminal activity in the future." *Midwest Grinding*, 976 F.2d at 1022–23 (quoting *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902). In determining whether RICO liability should result from allegations that the fraud is likely to recur, the Seventh Circuit advocates a multifactor continuity test. *Midwest Grinding*, 976 F.2d at 1023–24. Thus I must consider "the duration of time over which the predicate acts were committed, the number and variety of predicate acts, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries." *Id.* at 1024.

 Here, the number and variety of predicate acts clearly weigh against Fujisawa's RICO claim. It is well-established that "multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern." *Uniroyal*, 63 F.3d at 523 (quoted case omitted). In explaining this proposition, the court in *Uniroyal* pointed to *Lipin Enterprises Inc. v. Lee*, 803 F.2d 322 (7th Cir.1986). In *Lee*, the plaintiff had acquired a company from the defendants in what it alleged was a fraudulent transaction. (The *Uniroyal* court explained that the plaintiff in *Lee* alleged "a fraudulent acquisition of stock," 63 F.3d at 523, the same claim made here by Fujisawa.) The district court found twelve separate acts of mail fraud, but not a RICO pattern. The Seventh Circuit agreed, holding that multiple acts of mail fraud did not create the requisite threat of continued criminal activity. *Lee*, 803 F.2d at 324.

The court in *Uniroyal* went on to explain, however, that a single scheme of mail fraud does not always preclude a RICO pattern, citing *Liquid Air Corp. v. Rogers*, 834 F.2d 1297 (7th Cir.1987), *cert. denied*, 492 U.S.

917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989). In *Liquid Air*, the defendant, who leased compressed gas cylinders from the plaintiff, failed to return the cylinders when the lease terminated. The defendant then recruited a Liquid Air employee to generate nineteen separate false shipping orders indicating that the cylinders were being returned. *Id.* at 1300. The Seventh Circuit held that the nineteen separate false invoices were sufficient to constitute a RICO pattern because "[e]ach time an invoice was falsely prepared, it deprived Liquid Air of its entitlement to rent or replacement value. Therefore, each act resulted in a distinct injury to Liquid Air and a concomitant benefit to [the defendant]." *Id.* at 1304–05.

The court in *Uniroyal* analyzed the difference between *Lee* and *Liquid Air* as follows:

> In *Lee* ... there was an interdependence amongst the predicate acts, and each act was not responsible for a discrete injury. The various fraudulent representations made in *Lee* did not inflict separate harms; rather they were all necessary to perpetrate one large fraud.... On the other hand, in *Liquid Air*, each false invoice *on its own* deprived the plaintiffs of a specific amount of revenue. Each invoice represented a *discrete* attempt to defraud Liquid Air and *had little to do with* the previous or subsequent false invoices.

63 F.3d at 524 (emphasis added). Under this analysis, Fujisawa's allegations of mail fraud do not constitute a RICO pattern.

Fujisawa alleges that Kapoor committed mail fraud by mailing annual reports and other documents in furtherance of his scheme to induce Fujisawa to purchase Lyphomed. Like the documents mailed in *Lee*, each of Kapoor's mailings did not separately injure Fujisawa. In fact, many of the documents cited by Fujisawa as being mailed by Kapoor do not themselves contain any fraudulent statements or omissions. Thus without proving its injuries and Kapoor's entire Lyphomed scheme, Fujisawa could not establish that Kapoor had committed mail fraud.[15] For example, Fujisawa contends that Kapoor

---

**15.** In contrast, each false invoice in *Liquid Air* could stand for itself—the defendants engaged in a fraudulent scheme against the plaintiff (yield-ing a benefit to the defendant at the expense of the plaintiff) with each separate letter.

committed mail fraud by mailing a letter to "Fellow Shareholders," which prefaced Lyphomed's 1987 annual report. This letter itself contains no misrepresentations or statements which were made misleading by Kapoor's failure to disclose the faulty AN-DAs.[16] Kapoor may still have committed mail fraud by sending the letter, however, because he sent it in furtherance of his allegedly fraudulent scheme to induce Fujisawa to purchase Lyphomed. *See Richards v. Combined Insurance Co. of America,* 55 F.3d 247, 252 (7th Cir.1995) (recognizing that to demonstrate an act of mail fraud "it is not necessary to establish, as it is in the case of common law fraud, that there was a misrepresentation of present fact").

Similarly, Fujisawa alleges that the next year Kapoor sent another letter to "Fellow Shareholders," this one prefacing the 1988 annual report. Again Fujisawa could not establish by pointing exclusively to the letter that Kapoor had committed mail fraud, because the letter itself contained no misrepresentations or fraudulent omissions.[17] To prove that Kapoor had committed mail fraud, therefore, Fujisawa would need to demonstrate that Kapoor had engaged in a fraudulent scheme to induce Fujisawa to purchase Lyphomed by not disclosing Lyphomed's

faulty ANDAs and had mailed the letter to further that scheme.

Kapoor's alleged acts of mail fraud are therefore easily distinguished from the acts of the defendants in *Liquid Air.*[18] Unlike the false invoices sent by the defendants in *Liquid Air,* which each on its own constituted a fraud on the plaintiff, the mailings by Kapoor just helped to implement his fraudulent scheme. Fujisawa was not deprived of its property each time it received a Lyphomed annual report or other material from Kapoor, but the plaintiff in *Liquid Air* was. *See Liquid Air,* 834 F.2d at 1304–05 ("Each time an invoice was falsely prepared, it deprived Liquid Air of its entitlement to rent or replacement value [and] resulted in a distinct injury.") Instead, each mailing alleged by Fujisawa was just part of the overall scheme through which Kapoor ran Lyphomed, allowed it to file false data with the FDA, and then sold it to Fujisawa. The false invoices in *Liquid Air* could stand alone—the documents alleged to have been mailed by Kapoor can not.

Moreover, it does not matter that Fujisawa purchased Lyphomed through several separate stock acquisitions. Fujisawa does not allege that each stock purchase it made was tied to any particular act of mail fraud by

---

**16.** In this letter, Kapoor responded to FDA regulatory concerns about Lyphomed's manufacturing process by allegedly writing that "[o]ur quality record and relationship with the FDA has been virtually unblemished in my 10–year history, and resolution of these quality issues will be a top management priority in 1988." (Complaint ¶ 34) This statement was neither false when it was made, nor even rendered misleading by Kapoor's failure to tell Fujisawa about the deficient AN-DAs. At the time the letter was sent, Lyphomed's reputation with the FDA had not been blemished because the FDA had not yet discovered the ANDA problems. Moreover, Lyphomed's earlier manufacturing problems may indeed have been a top priority for Lyphomed. The fact that Lyphomed was being sloppy in its R & D department did not make Kapoor's assurances about the manufacturing problems fraudulent.

**17.** In that letter, in response to the manufacturing problems, Kapoor wrote that "[p]rocedures have been examined thoroughly to reverify that each product's documentation is a complete and accurate record *of the manufacturing process.*" (Complaint ¶ 36) (emphasis added). Fujisawa alleges that this document therefore

"misled Fujisawa and other stockholders into believing that each product's documentation had been reverified and audited." (Complaint ¶ 37) By its very terms, this sentence discusses only the documentation of the manufacturing process, and as alleged by Fujisawa, was responding to manufacturing problems. As Fujisawa itself has vigorously argued, the omission alleged by Fujisawa in this case relates exclusively to Lyphomed's R & D department. *See* Fujisawa Opp.Mem. at 21 (arguing that securities fraud suit about the manufacturing problems did not put Fujisawa on notice of its claim in this case because the manufacturing problems "were, in reality, *manufacturing problems* having absolutely nothing to do with Lyphomed's R & D data ... [and m]anufacturing problems are vastly different from lying to the FDA about the results of R & D experiments") (emphasis in original). The statement in the letter was therefore not rendered misleading by Kapoor's failure to disclose the deficient AN-DAs.

**18.** Many of the other documents alleged to have been mailed by Kapoor likewise do not contain fraudulent statements or omissions.

Kapoor, and the allegations in the complaint make it clear that Fujisawa's purchases were not so tied.[19]

In the words of the Seventh Circuit in *Uniroyal*, "[T]here [is] an interdependence amongst the predicate acts [alleged by Fujisawa], and each act was not responsible for a discrete injury. The various fraudulent representations [that Lyphomed had complied with FDA regulations] made [by Fujisawa] did not inflict separate harms; rather they were all necessary to perpetrate one large fraud [to induce Fujisawa to purchase Lyphomed]." 63 F.3d at 524. Moreover, each allegedly fraudulent statement by Kapoor did not "on its own" cause harm to Fujisawa. They were not "discrete attempt[s] to defraud [Fujisawa which] had little to do with the [other false mailings]." *Id.* They were all the same conduct—Lyphomed filed false information with the FDA and for five years Kapoor failed to disclose that fact. The acts of mail fraud alleged by Fujisawa therefore do not constitute a pattern justifying RICO liability. Accordingly, Count IV is dismissed.

### The State Law Claims

Because I dismiss Fujisawa's federal claims, I decline to exercise supplemental jurisdiction over its state law claims. *See* 28 U.S.C. § 1367(c)(3); *Martin–Trigona v. Champion Federal Savings & Loan Ass'n*, 892 F.2d 575, 578 (7th Cir.1989) ("The general rule is that when the federal claims are dismissed before trial, the district court should relinquish jurisdiction over any pendent state-law claim rather than resolve it on the merits."). Those claims will be dismissed without prejudice.

### Conclusion

For the reasons stated above, summary judgment on Counts I and III is granted to

Kapoor. Counts II and IV are dismissed for failure to state a claim upon which relief can be granted. Counts V, VI, VII and VIII are dismissed without prejudice.

---

**19.** Fujisawa alleges that it purchased stock from Kapoor or Lyphomed in December, 1984; July, 1985; August, 1985; October, 1986; and March, 1987. Fujisawa also alleges that it purchased Lyphomed stock from various other shareholders from January, 1985 to February, 1988. (Complaint ¶¶ 28, 29, 31) Fujisawa obtained the remaining stock of Lyphomed in a tender offer during late 1989 and the beginning of 1990. The alleged acts of mail fraud all relate to Form 10–Ks for the years ended 1983 through 1988. Fujisawa's purchases do not match up with the alleged acts of mail fraud. Moreover, Fujisawa alleges that it relied on many documents, not just particular documents mailed by Kapoor, in making certain purchases. *See, e.g.*, Complaint ¶ 28 (making December, 1984 purchase "after reviewing publicly available information contained in SEC filings"); Complaint ¶ 30 (making October, 1986 purchase based upon Lyphomed's Form 10–Ks for years ended 1983, 1984, and 1985).