**FUJISAWA PHARMACEUTICAL CO., LTD. and Fujisawa USA, Inc., Plaintiffs,**

**v.**

**John N. KAPOOR Defendant.**

**No. 92 C 5508.**

United States District Court, N.D. Illinois, Eastern Division.

Aug. 12, 1998.

942

Chaim T. Kiffel, Robert J. Kopecky, Kirkland & Ellis, Chicago, IL, Kenneth I. Schacter, Ted Poretz, Richards & O'Neil, New York, NY, for Plaintiffs.

George Carter Lombardi, Dan K. Webb, W. Gordon Dobie, Hurd Baruch, Michael Joseph Stepek, Hal B. Merck, Jennifer Jane Demmon, Winston & Strawn, Kathleen L. Leyden, Franczek, Sullivan, Mann, Crement, Hein, Relias, P.C., Chicago, IL, James N O Czaban, Bass & Ullman, P.C., New York, NY, for Defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

The plaintiffs, Fujisawa Pharmaceutical Co., Ltd. ("Fujisawa"), and Fujisawa USA, Inc. ("FUSA"), sued the defendant, John Kapoor, under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, and on a variety of state law grounds. Dr. Kapoor moves for summary judgment on all claims. For the following reasons, the motion is granted in part and denied in part.

### Background[1]

Fujisawa is a Japanese Pharmaceutical company. FUSA is a Delaware corporation and a wholly-owned subsidiary of Fujisawa. Between December of 1984 and August of 1989, Fujisawa purchased stock in Lyphomed, a pharmaceutical company run by John Kapoor, its principal shareholder and executive. Lyphomed was acquired on April 5, 1990 and merged into FUSA.

---

**1.** This is the second time Dr. Kapoor moves for summary judgment. I granted his first motion. *Fujisawa Pharmaceutical Co., Ltd. v. Kapoor,* 936 F.Supp. 455 (N.D.Ill.1996). The Seventh Circuit affirmed in part and reversed in part. *Fujisawa Pharmaceutical Co., Ltd. v. Kapoor,* 115 F.3d 1332 (7th Cir.1997). Familiarity with previous opinions is presumed.

Under Dr. Kapoor's management, Lyphomed produced both proprietary and generic drugs. A proprietary drug is a new patented drug, while generic drugs are versions of patented drugs ordinarily sold after the patent on the proprietary drug expires. Before a company can manufacture and sell a generic drug, it must submit an abbreviated new drug application ("ANDA") to the Food and Drug Administration ("FDA") for approval. An ANDA contains research and development ("R & D") data demonstrating to the FDA that the proposed generic product is equivalent to the patented product being copied and is therefore safe and effective for human use. Based on the information contained in the ANDA, the FDA decides whether to allow the company to produce the generic drug.

Beginning in 1980 and continuing through 1989, Fujisawa claims Lyphomed filed false applications and information with the FDA in connection with thirty-five of its ANDAs. Fujisawa claims many Lyphomed ANDAs violated FDA rules because they contained normalized data without disclosing that fact [2] and that Lyphomed failed to disclose adverse test results and failed to record, or destroyed the results of, certain tests in violation of the FDA's ANDA regulations. Fujisawa alleges that Dr. Kapoor knew or should have known that Lyphomed had committed all these violations of FDA rules.

In March, 1983, Lyphomed filed an initial public offering with the Securities and Exchange Commission ("SEC"). This filing did not disclose Lyphomed's ongoing ANDA violations. Pursuant to an agreement dated December 3, 1984, Fujisawa purchased 450,000 Lyphomed shares from Lyphomed and 320,000 from Dr. Kapoor. At that time, Dr. Kapoor did not disclose any information about Lyphomed's ANDA violations. Fujisawa continued to purchase additional shares in Lyphomed from both Lyphomed and Dr. Kapoor in several transactions. In making these transactions, Fujisawa allegedly relied on various Form 10–Ks filed by Lyphomed and signed by Dr. Kapoor, annual reports, and other statements issued by Dr. Kapoor. None of these documents disclosed the ANDA violations. By March 1988, Fujisawa owned twenty-eight percent of Lyphomed.

During 1987 and 1988, Lyphomed was cited by the FDA as having Good Manufacturing Practices ("GMP") problems at some of its plants.[3] By the end of 1988, Lyphomed had received eight FDA Observation Reports (known as Form 483s) and an FDA regulatory letter. Form 483s list observations made by an FDA inspector during an inspection of a plant. When a company receives a Form 483, it usually submits a written response to the FDA disputing or explaining the inspector's observations, or promising to correct the problem if the company agrees that it exists. Ordinarily, if the FDA finds the company's response acceptable, the FDA will take no further action. If the FDA finds the company's response unacceptable, the FDA may take further action such as the issuance of a regulatory letter.

The regulatory letter Lyphomed received as a result of the Form 483s was serious—it informed Lyphomed that it would not be given any new approvals for generic or patented pharmaceutical products until Lyphomed cured the GMP deficiencies (which was subsequently done). In response to the letter, Dr. Kapoor and Lyphomed reassured Fujisawa and other stockholders that Lyphomed was addressing the GMP concerns. Fujisawa then bought more Lyphomed shares on the open market and, in August of 1989, Fujisawa made a tender offer for the remaining shares of Lyphomed. Lyphomed merged into FUSA on April 6, 1990.

FUSA's present problems began in February of 1991 when the FDA initiated an investigation of Lyphomed's ANDAs. In the course of that investigation, the FDA unearthed many ANDAs submitted by Lyphomed between 1980 and 1989 containing allegedly false information. In May, 1991,

---

**2.** Normalizing data is the process of assuming that a drug's potency is 100 percent for purposes of measuring how it degrades over time although the actual potency at the start of the test is, in fact, higher or lower than 100 percent.

**3.** These problems related to flaws in the manufacturing process for some of Lyphomed's products that had already been approved by the FDA for marketing and sale to the public.

FUSA was placed on the Alert List, meaning that the FDA would not process or approve any new drug applications or any ANDAs. The FDA issued its first Form 483 in November of 1991. In response, FUSA undertook its own audit of Lyphomed's ANDAs, withdrawing many of its products from the marketplace.

In this suit, Fujisawa[4] alleges Dr. Kapoor committed securities and mail fraud by failing to disclose the fact that Lyphomed violated FDA rules and filed false information in its ANDAs. According to Fujisawa, the many acts of fraud constitute an illegal pattern of racketeering under RICO. The complaint also alleges state-law violations involving fraud, breach of fiduciary duties, breach of warranty, and constructive trust.

### Statute of Limitations[5]

■ There is a four-year statute of limitations in civil RICO cases. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). In the Seventh Circuit, the limitations period begins to run "once there was a RICO violation and the plaintiffs knew or should have known that they were injured." *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1464 (7th Cir.1992) (citation omitted). Fujisawa filed its complaint on August 17, 1992. Thus, if Fujisawa either knew or should have known it was injured by August 17, 1988, its claim is time-barred.

■ Fujisawa alleges Dr. Kapoor was aware the ANDAs were fraudulent and thus, committed securities fraud and mail fraud. The issue is when Fujisawa should have discovered the ANDA fraud because at that point, Fujisawa should have known of its injury.

Dr. Kapoor points to a variety of evidence to argue that Fujisawa should have discovered the fraud, and thus its injury, before August, 1988. Dr. Kapoor says Fujisawa had access to Lyphomed's documents before August, 1988. There is a genuine issue of material fact as to which documents Fujisawa had access to before the merger. (Rule 12(M) Statement & Rule 12(N) Response ¶ 18). Further, the Seventh Circuit rejected "the suggestion that the defrauded purchaser of a company is presumed to be on notice of everything in the company's files, so that the statute of limitations begins to run at the moment of acquisition." *Fujisawa*, 115 F.3d at 1335. There must be suspicious circumstances to alert Fujisawa of the need to review ANDA documents. *Id.*

Dr. Kapoor argues that Lyphomed's FDA problems in 1987 and 1988 should have alerted Fujisawa to the ANDA fraud. Lyphomed's 1987 and 1988 FDA problems, however, dealt with manufacturing concerns at its production plants and not with the R & D data that was submitted in the ANDAs. (Rule 12(N) Response ¶ 170). Dr. Kapoor testified that the Form 483 issued by the FDA in relation to the manufacturing problems would not have alerted him to lying in the R & D area. (Rule 12(N) Response ¶ 172; Kapoor 12/1/94 Dep. at 820). Further, according to Takashi Aoki, Fujisawa's representative on Lyphomed's Board of Directors during the 1980s, Dr. Kapoor repeatedly reassured him that Lyphomed's manufacturing problems had nothing to do with the rest of the company, particularly R & D. (Aoki Aff. ¶ 15).[6]

Dr. Kapoor argues that, prior to August 1988, Lyphomed employees told Fujisawa that Lyphomed was rushing ANDAs out too quickly. (Rule 12(M) Statement ¶ 151). One of the individuals who expressed concerns

---

**4.** From this point on, Fujisawa and FUSA together will be referred to simply as Fujisawa.

**5.** Dr. Kapoor's 12(M) Statement is cited as "Rule 12(M) Statement ¶ ___" and Fujisawa's 12(N) response is cited as "Rule 12(N) Response ¶ ___." Fujisawa's statement of additional facts is cited as "Rule 12(N) Statement ¶ ___" and Dr. Kapoor's response is cited as "Rule 12(M) Response ¶ ___." Documents attached to Fujisawa's 12(N) Response are cited as "APP-" and documents at-

tached to Fujisawa's 12(N) Statement are cited as "AD-." Dr. Kapoor's documents are cited as "Tab ___."

**6.** While Dr. Kapoor argues that the any distinction between the manufacturing problems and the R & D problems is a false dichotomy, the evidence, as noted above, indicates Dr. Kapoor considered the manufacturing problems distinct from R & D issues.

about the speed of Lyphomed's ANDAs, Douglas Cary, was a former Lyphomed employee and a competitor of Lyphomed who was attempting to get Fujisawa to do business with his company. (Rule 12(N) Response ¶ 151). Mr. Cary testified he was unaware of Lyphomed ever filing false or misleading data with the FDA and never informed Fujisawa that Lyphomed had filed false or misleading ANDAs. *Id.* Jeff Yordon, a Lyphomed employee, testified he told Fujisawa employees that he thought Lyphomed would fail under Dr. Kapoor's management. (Rule 12(M) Statement ¶ 151). Mr. Yordon's comments, however, were directed towards Dr. Kapoor's management style and had nothing to do with R & D data or ANDAs. (Rule 12(N) Response ¶ 151; Yordon Dep. at 133).

Dr. Kapoor also notes that a securities fraud class action ("Harman suit"), in which Fujisawa participated, was filed against Lyphomed and Dr. Kapoor in January, 1988. The Harman suit, however, arose from the manufacturing problems Lyphomed encountered. (Rule 12(N) Response ¶ 185). The complaint in the Harman suit alleges Lyphomed made false comments regarding its ability to submit timely ANDAs because Lyphomed knew the FDA was going to prohibit it from submitting new drug applications until it resolved its manufacturing problems, not because of misleading information contained in the ANDAs. (Harman 2d Amended Complaint ¶ 26; APP–3371). Dr. Kapoor testified that none of the allegations in the Harman suit raised any concerns with respect to improprieties in Lyphomed's R & D department. (Rule 12(N) Response ¶ 190; 12/1/94 Kapoor Dep. at 885).[7]

While Dr. Kapoor presents an array of evidence that could have alerted Fujisawa to ANDA fraud before August, 1998, Fujisawa has raised a genuine of issue of fact as to whether this evidence was sufficient to alert it to the ANDA fraud.

### Securities Fraud

To establish a civil RICO claim Fujisawa must prove Dr. Kapoor "(1) conduct[ed] (2)[ ]

an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (footnote omitted). Fujisawa alleges a string of securities frauds that make up the pattern of racketeering activity in this case. To prove a securities fraud violation under Rule 10b–5, Fujisawa must prove Dr. Kapoor "1) made a misstatement or omission, 2) of material fact, 3) with scienter, 4) in connection with the purchase or sale of securities, 5) upon which the [Fujisawa] relied, and 6) that reliance proximately caused [Fujisawa's] injury." *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329, 1331 (7th Cir.1995) (citation omitted). Dr. Kapoor challenges Fujisawa's ability to prove scienter, materiality, and reliance.

#### A. Scienter

■ Fujisawa may establish scienter with evidence Dr. Kapoor knew he was misleading Fujisawa or acted recklessly in making representations or omissions to Fujisawa. *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1043–45 (7th Cir.1977). Circumstantial evidence is sufficient to prove scienter. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

Dr. Kapoor argues that all of the Lyphomed chemists and managers Fujisawa named as knowing about his fraud testified that, in fact, Dr. Kapoor was not aware of and was not involved in any fraud. (Rule 12(M) Statement ¶¶ 45–65). Fujisawa notes that the names it provided Dr. Kapoor were in response to an interrogatory that requested the names of chemists and managers who "may have" knowledge of Dr. Kapoor's fraud. (Rule 12(N) Response ¶¶ 34, 44). Quite clearly, Fujisawa's list was over-inclusive. Further, Fujisawa contends that the evidence suggests some of Lyphomed's chemists and managers were aware of Dr. Kapoor's fraud.

Fujisawa cites a memorandum by Abu Alam, Vice President of R & D, that indicates he and Dr. Kapoor made a decision to normalize data for the Floxuridine ANDA.

---

7. The fact that Lyphomed's stock fell and Dr. Kapoor's role in the company was reduced after

Lyphomed encountered manufacturing problems does not indicate Lyphomed falsified ANDAs.

(Rule 12(N) Statement ¶ 46). The normalization was not disclosed to the FDA. (Rule 12(N) Statement ¶ 48). Thus, to the FDA, the Floxuridine data appeared to have a beginning potency of 100% and degraded from that percentage over time. In reality, the drug began at a lower potency percentage and degraded to a degree that might have caused the FDA to question the Floxuridine ANDA if non-normalized data had been submitted. (Rule 12(N) Statement ¶ 48). The FDA noted unreported normalization as a basis for the Form 483s issued on Lyphomed ANDAs in November, 1991. (Pl.App. X at App–3095).[8] Jim Heinicke, one of Lyphomed's chemists involved in the normalization of Floxuridine, thought normalizing the data without noting normalization was dishonest. (Rule 12(N) Statement ¶ 47).

Dr. Kapoor argues that the normalization was made known to the FDA and regardless, there is no proof he was aware the normalization would not be noted in the Floxuridine ANDA. Based on Dr. Kapoor's position with Lyphomed, his participation with the normalization of Floxuridine, and his association with Lyphomed's R & D Department and the rapid production of ANDAs,[9] an inference can be drawn that Dr. Kapoor was aware the Floxuridine ANDA would not note the normalization. Additionally, it is unclear whether the normalization was, in fact, ever made known to the FDA. Lyphomed did send additional data to the FDA after the FDA issued a deficiency letter on the Floxuridine ANDA. (Rule 12(M) Response ¶ 46). The additional data, however, was only sent in response to the FDA deficiency letter. Dr. Kapoor's scienter in submitting normalized data in the Floxuridine ANDA is not diminished by any data later provided at the behest of the FDA. Further, it is unclear if the additional data Lyphomed provided was sufficient to alert the FDA of normalization in the Floxuridine ANDA. (Rule 12(M) Response ¶ 46). The

additional data does not state normalization occurred in the Floxuridine ANDA.

Fujisawa also presents a note written by David Noll, a project supervisor in Lyphomed's marketing department, at a Lyphomed New Products Committee meeting on April 4, 1986. (Rule 12(M) Statement ¶ 128). The note states: "Do not submit questionable data, out-of-specs, etc. SOP in place in R & D." *Id.* Mr. Noll attributed this comment to Dr. Kapoor and noted Dr. Kapoor added it was "stupid" to submit questionable data because it would "merely delay FDA approval." (Noll Tr. at 24). Dr. Kapoor argues his comment was only addressed to one particular batch of a drug, Vancomycin, which had not been prepared correctly. (Rule 12(M) Statement ¶ 129). Mr. Noll testified that he believed Dr. Kapoor's comment may only have been directed towards Vancomycin or may have been a general proposition that was to be followed with all questionable data. (Noll Tr. 25–26, 51–55). On its face, the statement indicates not submitting questionable data was to be "SOP [Standard Operating Procedure]," and thus, a reasonable inference may be drawn that the statement was to be followed on all questionable data.

Dr. Kapoor argues that out-of-specification data was submitted with the Vancomycin ANDA and that Lyphomed submitted fifty-five out-of-specification test results on the thirty-five ANDAs at issue in this case.[10] The FDA, however, in issuing its Form 483s in November, 1991, noted certain Lyphomed ANDA submissions were deficient for failing to report out-of-specification data. (Pl.App. X at App–3099, 3101).[11] Additionally, other Lyphomed chemists believed out-of-specification numbers should not be reported. Melissa Wilson testified that Dulal Chatterji, a Lyphomed Director of R & D who reported to Dr. Kapoor, told her that "numbers should

---

**8.** While normalization may be a valid scientific technique, normalization without noting the practice has the potential to be misleading and thus, fraudulent.

**9.** Rule 12(N) Statement ¶¶ 5–23.

**10.** Out-of-specification data is data that falls outside the guidelines necessary for a generic drug

to be considered the equivalent of the product being copied.

**11.** In twenty-one of the thirty-five ANDAs at issue in this case, Fujisawa alleges failure to submit out-of-specification data to the FDA. (Rule 12(N) Statement ¶ 41).

never be reported out of specification...." (Rule 12(N) Statement ¶ 39). While Ms. Wilson testified she thought the results Dr. Chatterji wanted discarded may have been faulty, the comment could be interpreted as a general proposition that Lyphomed's questionable data was not to be reported to the FDA. Further, Anne O'Connor, another Lyphomed chemist, testified that Lyphomed generally did not report out-of-specification data. (Rule 12(N) Statement ¶ 41; Rule 12(N) Response ¶ 98). While both Ms. Wilson and Ms. O'Connor testified that they never got directions from Dr. Kapoor to falsify data, in light of Dr. Kapoor's statement to Mr. Noll and the Floxuridine memo, a finder of fact could reasonably infer that Dr. Kapoor was aware of and countenanced the failure to report out-of-specification data.[12]

Dr. Kapoor argues that Fujisawa's own fraud auditors confirm his lack of fraud in the ANDAs. (Rule 12(M) Statement ¶¶ 114, 117–119). Fujisawa's auditors testified, however, that their main focus was not "who" was involved in fraud, but "whether" fraud occurred. (Rule 12(N) Response ¶¶ 114, 117–119). Further, to the extent Fujisawa's auditors identified employees responsible for fraud, they testified their main goal was to identify current Fujisawa employees that may have been responsible for fraud. *Id.* They also testified Dr. Kapoor's name was mentioned in relation to wrongdoing, particularly in regards to normalization. (Rule 12(N) Response ¶ 119).

In sum, there is sufficient circumstantial evidence from which a finder of fact could conclude that Dr. Kapoor was aware Lyphomed ANDAs did not alert the FDA to normalized data and omitted out-of-specification data, rendering the ANDAs misleading and fraudulent.[13]

*B. Materiality and Reliance*

▪ Dr. Kapoor argues any misrepresentations he made regarding the ANDAs were not material to Fujisawa's decision to purchase Lyphomed and that Fujisawa did not rely on these misrepresentations. "An omission or misstatement is material if a substantial likelihood exists that a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security and on what terms to buy or sell." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir.1988). "Materiality presents a mixed question of law and fact, and as the Court in *TSC Industries* emphasized, '[t]he determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of these facts to him and these assessments are peculiarly ones for the trier of fact.'" *McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 466 (7th Cir.1981) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Reliance is proven by showing "the defendant's misstatement or omission played a substantial part in the plaintiff's investment decision." *Rowe*, 850 F.2d at 1233. In contradiction to his scienter argument, Dr. Kapoor presents a variety of evidence to argue that ANDA fraud was obvious at the time Fujisawa invested and thus, the ANDA fraud was not material to Fujisawa's investment decisions and Fujisawa did not rely on any misstatements or omissions.

Dr. Kapoor argues that the deletion of a section of a draft merger agreement ("Section 4.15") prepared in July, 1989, should have alerted Fujisawa to fraudulent ANDAs.[14] Section 4.15 was a representation by

---

**12.** Fujisawa notes at least two other instances where out-of-specification stability data was not reported to the FDA. (Rule 12(N) Statement ¶¶ 67–78). Instead of reporting the data Lyphomed inserted hyphens that indicated no data was available for particular stability periods. *Id.*

**13.** Dr. Kapoor argues there is insufficient evidence to demonstrate a "pattern of racketeering activity." If Fujisawa can prove Dr. Kapoor was involved in ongoing ANDA fraud Fujisawa can show a pattern of racketeering activity. The parties have separately briefed the issue of

whether Fujisawa may rely on six laboratory notebook pages Dr. Kapoor claims were not produced during discovery. Although I did not rely on the notebooks in deciding the motion for summary judgment, to avoid future argument over this issue I find that Fujisawa met its discovery obligations and the notebook pages may be offered as evidence.

**14.** The deleted section states, in pertinent part:

Section 4.15 *Drugs and Pharmaceutical Products* (a) Except as set forth in Section 4.15 of

Lyphomed that no set of facts existed that would require withdrawal of any of Lyphomed's pharmaceutical products. Dr. Kapoor notes that Fujisawa's legal counsel on the merger suggested particular attention be paid to Section 4.15. (Rule 12(M) Statement 238). Lyphomed's outside directors refused to include Section 4.15 in the final merger agreement and thus, Dr. Kapoor argues, Fujisawa should have been aware that the company submitted fraudulent ANDAs. The outside directors, however, struck nine of eighteen warranties and representations from the draft agreement on topics from ERISA to environmental matters. (Rule 12(N) Response ¶ 238). Under Dr. Kapoor's reasoning, Fujisawa should also have been alerted to fraud in nine other areas. Further, since the outside directors testified they

were unaware of the fraudulent ANDAs, it is illogical to believe the deletion of Section 4.15 was a conscious effort to avoid future liability and to alert Fujisawa that fraudulent ANDAs existed. *Id.*

Fujisawa states it agreed to delete Section 4.15 because the same representations already existed in Section 4.05 of the merger agreement.[15] Section 4.05 represented that none of the financial statements Lyphomed filed in connection with the merger contained any untrue statements of material fact or omitted any statements of material fact. Lyphomed's lead counsel on the merger, Thomas Cole, testified that, in theory, Section 4.05 covered the subject of FDA generic drug investigations. *Id.;* (Cole Dep. at 87–89).

Dr. Kapoor also argues that Fujisawa, in Section 1.01 of the final merger agreement,

the Disclosure Schedule and the SEC Reports, to the best knowledge of the Company [Lyphomed] there exists no set of facts (i) which the Company reasonably believes could furnish a reasonable basis for the withdrawal or suspension of any approved New Drug Application or other pre-market product approval, or the termination of any Investigational New Drug Exemption or other investigational use exemption, or the request for a recall of any product subject to any such approval or exemption, by the United States Food and Drug Administration ("FDA") or any other governmental regulatory agency (foreign or domestic), with respect to any product sold by the Company or any of its subsidiaries on a consolidated basis (a "Pharmaceutical Product"), (ii) which the Company reasonably believes could furnish a basis for withdrawal, suspension or recall by order of any state, federal or foreign court of law of any such Pharmaceutical Product, (iii) which the Company reasonably believes would otherwise be expected to cause the Company or any of its subsidiaries to withdraw, suspend or recall any such Pharmaceutical Product from the market or to restrict the marketing classification of any such Pharmaceutical Product or to terminate or suspend clinical testing of any such Pharmaceutical Product or (iv) which the Company reasonably believes would have a material adverse effect on the continued operation of any plant of the Company or any of its subsidiaries (including without limitation, with respect to each of the foregoing clauses (i), (iii), and (iv), any pending or threatened hearing regarding drug effectiveness with respect to a Pharmaceutical Product having an approved New Drug Application for safety or not required to have obtained any such pre-market approval by virtue of claimed "grandfather" status under the Federal Food, Drug, and Cosmetic Act) . . . .

(Kapoor Tab 236).

**15.** Section 4.05 states:

Section 4.05 *Reports.* The Company [Lyphomed] has filed all required forms, reports and documents with the SEC since January 1, 1988 (collectively, the "SEC Reports"), all of which (as they may have been amended prior to the date hereof) were prepared in accordance with the applicable requirements of the Securities Act of 1933 and the Exchange Act. Copies of all such SEC Reports have been made available to Acquisition by the Company. None of the SEC Reports, including without limitation any financial statements or schedules included therein (as they may have been amended prior to the date hereof), as of their respective filing dates, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. None of the subsidiaries of the Company is required to file any reports, statements, forms or other documents with the SEC. Each of the consolidated financial statements (including the related notes) included in the SEC Reports has been prepared in accordance with generally accepted accounting principles applied on a consistent basis (except as otherwise stated in such financial statements, including the related notes) and each fairly presents the consolidated financial position of the Company and its subsidiaries as of the respective dates thereof, or the consolidated results of its operations and changes in financial position for the periods indicated, as the case may be, except, in the case of interim financial statements, for normal year-end audit adjustments.
(Pl.App–4035)

agreed that ANDA fraud would not be material to its decision to buy Lyphomed.[16] Paragraph (b) of Annex A of the merger agreement permitted Fujisawa to terminate the merger if a "material adverse change" occurred before closing the merger. (Pl. App–4084). Section 1.01 states that specific events listed in a Disclosure Schedule attached to the merger agreement would not be considered "material adverse change[s]" for purposes of Paragraph (b) of Annex A. Among the events cited in the Disclosure Schedule was "[a]ny consequence resulting from investigation made by the FDA or other governmental agencies relating to manufacturing practices, the filing of ANDA materials, priority of processing of ANDAs, support data behind ANDAs and any fraudulent practices involving the generic drug industry." (Rule 12(M) Statement ¶ 240; Pl. APP–4090). Thus, Dr. Kapoor argues, Fujisawa did not consider ANDA fraud material to its purchase.

The merger agreement, however, does not indicate that ANDA fraud was immaterial to Fujisawa. Rather, Section 9.10(c) of the merger agreement specifically indicates that nothing in the Disclosure Schedule is meant to be considered in determining what was or was not material to Fujisawa. Section 9.10(c) states "the inclusion of any specific item in the Disclosure Schedule hereto is not intended to imply that . . . the items so included or other items, *are or are not material,* and neither party shall use the fact of . . . any such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not material for purposes of this Agreement." (Rule 12(N) Response ¶ 240; Pl. App–4079) (emphasis added). Thus, while ANDA fraud, if it was included in the terms of the Disclosure Schedule,[17] might not have qualified as a "material adverse change" for purposes of closing the merger, it is clear the Disclosure Schedule was not meant to have a bearing on what Fujisawa considered material to its purchase of Lyphomed. Indeed, Mr. Aoki, Fujisawa's representative on Lyphomed's board, indicates that if Fujisawa had known of the fraudulent ANDAs it never would have acquired Lyphomed. (Aoki Aff. ¶¶ 2, 14, 24).

Lyphomed argues Section 9.10(c) does not render immaterial the matters included in the Disclosure Schedule. Lyphomed cites the deposition of one of its lawyers on the merger, Janet Kelly, who testified that Fujisawa had made an offer for Lyphomed in the face of an investigation into the generic drug industry and the Disclosure Schedule made Fujisawa take the risk of a problem occurring before closing. (Rule 12(M) Statement ¶ 240). Lyphomed's generic drug problems, however, dealt with manufacturing issues and not R & D issues. No member of the negotiating team responsible for drafting the merger agreement was aware of Lyphomed's ANDA fraud and thus, the Disclosure Schedule could not have been a direct attempt to alert Fujisawa to ANDA fraud.[18]

Dr. Kapoor also contends that Fujisawa had access to information that would have

---

**16.** Section 1.01 states, in pertinent part:
Section 1.01 *The Offer* (a) As soon as practicable, but in no event later than five business days from the public announcement of the terms of this Agreement, Acquisition shall commence an offer to purchase for cash (the "Offer") all of the Company's outstanding shares (the "Shares") of common stock, par value $.01 per share ("Common Stock"), at a price of $31.87 per Share, net to the seller in cash. The obligation of Acquisition to commence the Offer shall be subject to the conditions set forth in clause (iv) of the first paragraph of Annex A, and the obligation of Acquisition to accept for payment and pay for Shares tendered pursuant to the Offer shall be *subject to all of the conditions set forth in Annex A hereto; provided, however,* that no material adverse change shall be deemed to have occurred for the purposes of paragraph (b) thereof as a result of the occurrence of any event set forth in Section 1.01 of the disclosure schedule previously delivered to Acquisition (the "Disclosure Schedule"). . . .
(Rule 12(N) Response ¶ 240; APP–4007).

**17.** It is unclear whether the section of the Disclosure Schedule cited by Dr. Kapoor encompasses the ANDA fraud at issue in this case.

**18.** Fujisawa was aware that the generic drug industry had an uncertain future at the time of the acquisition. (Rule 12(M) Statement ¶¶ 232–233). But knowledge about the uncertainty of a drug industry in general is not an indication that Fujisawa was aware of ANDA fraud or considered such fraud immaterial to its purchase of Lyphomed.

alerted it to the ANDA fraud and thus, cannot complain about its materiality. While Fujisawa may have had access to the information, the evidence before me indicates Fujisawa had no reason to believe such fraud existed and thus, no reason to look for such fraud. Additionally, to discover the fraud would have required review of many thousands of documents and laboratory notebooks to determine if Lyphomed's ANDAs were consistent with the R & D data. Based on the enormity of the audit that took place after the FDA issued the Form 483s in 1991, such a review would have been a monumental task.[19] As the Seventh Circuit has noted, "[t]he buyer's investigation of things already known to the seller is a wasteful duplication of effort.... [W]e will not establish a legal rule under which investors must resort to the costly self-help approach of investigation on pain of losing the protection of the principal legal safeguard, the rule against fraud." *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 528 (7th Cir.1985).

Dr. Kapoor also argues that Lyphomed's 1987 and 1988 FDA problems should have alerted Fujisawa to a risk of ANDA fraud in the future. As noted above, Lyphomed's 1987 and 1988 FDA problems dealt with manufacturing issues and not R & D issues, a distinction even Dr. Kapoor found important. (Rule 12(N) Response 172).[20] Dr. Kapoor also argues that Fujisawa was aware of the "Kapoor Policies" and thus, could not have considered them material.[21] It is disputed whether Fujisawa knew of the "Kapoor Policies." (Rule 12(N) Response ¶¶ 213–220). Regardless, I do not find the "Kapoor Policies" are persuasive to show Dr. Kapoor

should have been aware ANDA fraud was occurring at Lyphomed. Accordingly, I do not find Fujisawa's knowledge of the "Kapoor Policies," if such knowledge did exist, would have alerted Fujisawa to ANDA fraud.

Fujisawa presents the testimony of Mr. Aoki and Hirofumi Onosaka, Manager of Fujisawa's Corporate Planning Department, both of whom dealt directly with Dr. Kapoor and helped plan Fujisawa's acquisition of Lyphomed. Both declare that Fujisawa was unaware of Lyphomed's ANDA fraud, that Dr. Kapoor assured them Lyphomed would have no further FDA problems, and that Fujisawa would never have acquired Lyphomed if it had known of the ANDA fraud. (Pl. Aoki Aff; Onosaka Aff.). Given the totality of the evidence, there exists genuine issues of fact as to the materiality of the ANDA fraud and Fujisawa's reliance.

### Harman Release

■ As noted above, Fujisawa participated in a class action lawsuit against Lyphomed and Dr. Kapoor that arose from the FDA problems in 1987 and 1988. Fujisawa signed a release when it settled with Lyphomed and Dr. Kapoor. Fujisawa released Dr. Kapoor from any claim "asserted or which could have been asserted...arising out of the subject matter..." of the Harman suit. (Rule 12(M) Statement ¶ 188; Pl. App–3352). Dr. Kapoor argues that the release bars this suit.

As an initial matter, Dr. Kapoor waived the release defense by failing to raise it in his answer. Fed.R.Civ.P. 8(c); *accord Pinto Trucking Serv., Inc. v. Motor Dispatch, Inc.,*

---

**19.** One of Fujisawa's experts indicates such reviews are "never" undertaken when a company acquires a generic pharmaceutical company. (Pl.APP–2598).

**20.** Dr. Kapoor cites another case in this district to argue that the ANDA fraud in this case was "reasonably foreseeable" based on Lyphomed's previous FDA problems. *Medco Research, Inc. v. Fujisawa USA, Inc.,* No. 93 C 2705, No. 93 C 2724, 1994 WL 719220, at *12 (N.D.Ill.Dec.21, 1994). The *Medco* case dealt with different evidence between different companies and, while the opinion indicates that some future FDA regulatory problems were reasonably foreseeable based on the 1987 and 1988 manufacturing prob-

lems, the court did not hold the specific ANDA fraud at issue in this case was "reasonably foreseeable." Thus, I do not find the *Medco* opinion persuasive on this point.

**21.** Both parties have labeled a certain set of Dr. Kapoor's operating instructions the "Kapoor Policies." Dr. Kapoor had goals of completing 10 ANDAs per month, transferring products from R & D to Regulatory Affairs within three months of receiving raw materials, and responding to FDA deficiency letters within two days. (Rule 12(M) Statement ¶¶ 193–223). Other Kapoor goals may have existed. Fujisawa argues the aggressive "Kapoor Policies" resulted in an environment at Lyphomed that inevitably led to ANDA fraud.

649 F.2d 530, 534 (1981). Furthermore, none of the stock purchases at issue in this case fell within the Harman class period. While Dr. Kapoor wishes to give the release the broadest reading possible, he admitted the FDA problems that resulted in the Harman suit did not raise concerns about Lyphomed's R & D department. (Rule 12(N) Response ¶ 190; 12/1/94 Kapoor Dep. at 885). Thus, to the extent Fujisawa released claims arising from the "subject matter" of the Harman suit, it does not follow that the claims in this suit were part of the subject matter of the Harman suit.

Finally, a general release only covers claims that a party knows of or could discover through reasonable inquiry. *Fair v. International Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1116 (7th Cir.1990). As noted above, a review of all of Lyphomed's ANDAs and R & D data would have been a monumental task and thus, the claims in this case could not have been discovered through a "reasonable" inquiry.

### State Law Claims

Dr. Kapoor moves for summary judgment on Fujisawa's state law claims of common law fraud, breach of warranty, breach of fiduciary duty, and constructive trust.

### A. Common Law Fraud

█ Dr. Kapoor argues that a recent Illinois Appellate Court decision mandates a three-year statute of limitation for fraud actions that arise under the Illinois Securities Law. *Tregenza v. Lehman Bros., Inc.*, 287 Ill.App.3d 108, 222 Ill.Dec. 607, 678 N.E.2d 14 (1st Dist.1997), *appeal denied,* 174 Ill.2d 595, 227 Ill.Dec. 17, 686 N.E.2d 1173 (Ill. 1997). The Illinois Securities Law states "[n]o action shall be brought for relief under this Section or *upon or because of any of the matters for which relief is granted by this Section* after 3 years from the date of sale...." 815 ILCS 5/;13(D) (emphasis added). The *Tregenza* court held that common law claims premised on relief under the Illi-

nois Securities Law are governed by the statute of limitations in the Illinois Securities Law because such claims are premised upon "matters for which relief is granted...." 678 N.E.2d at 15, 222 Ill.Dec. at 608. The limitations period begins to run from the date of the securities transaction. But, the limitations period may be extended to five years if, even with reasonable diligence, ·Fujisawa could not have discovered the alleged securities violations. 815 ILCS 5/13(D)(2).

As noted above, the exercise of reasonable diligence would not have alerted Fujisawa to the ANDA fraud. Thus, Fujisawa may premise its fraud claim on all securities transactions that occurred after August 17, 1987. Securities transactions before that date are barred by the statute of limitations.

Dr. Kapoor also argues Fujisawa's fraud claim fails because he did not know of any false statements and his statements were not material. Since I have found genuine issues of fact as to these issues, summary judgment is inappropriate.

### B. Breach of Warranty

Dr. Kapoor argues that Fujisawa's breach of warranty is barred under the *Tregenza* ruling. Fujisawa complains that Dr. Kapoor breached a 1984 written stock purchase agreement that was executed with Fujisawa's first purchase of Lyphomed stock. Fujisawa argues that since the basis of its breach of warranty claim is a contract rather than a "matter" for which relief is granted under the Illinois Securities Law, this claim is governed by the ten-year statute of limitations for breach of contract. 735 ILCS 5/13–206. Dr. Kapoor has not rebutted this argument and it is unclear, at best, how the breach of a stock purchase agreement would constitute a violation of the Illinois Securities Law. Summary judgment is inappropriate.[22]

### C. Breach of Fiduciary Duty

█ Dr. Kapoor argues Fujisawa's breach of fiduciary duty is barred by a three-year statute of limitations which begins to run

---

**22.** Dr. Kapoor also suggests summary judgment is appropriate on the breach of warranty claim because he was unaware of any ANDA fraud in 1984 and thus, made no improper representa-

tions in the stock purchase agreement. As noted above, there is a genuine issue of fact regarding whether Dr. Kapoor was aware of ANDA fraud as early as 1984.

from the time the " 'key information is discovered or should have been discovered....' " *Litman v. Prudential–Bache Properties, Inc.,* No. 61,1993, 1993 WL 603303, *1 (Del. Nov.18, 1993) (quoting *Bradley v. Maryland Cas. Co.,* 563 F.Supp. 602, 607 (D.Del.1983)). Based on the above analysis, there is a genuine issue of fact as to whether Fujisawa should have known of the ANDA fraud before August 17, 1989.[23]

### D. Constructive Trust

■ Dr. Kapoor argues that Fujisawa's claim for a constructive trust is inappropriate because a constructive trust is a remedy, not a claim. A constructive trust is an equitable remedy, not an independent cause of action. *Scholes v. Ames,* 850 F.Supp. 707, 712–13 (N.D.Ill.1994). To the extent Fujisawa delineates a separate claim for a constructive trust, it is superfluous. A constructive trust, however, may be "imposed where there is a breach of a fiduciary duty or when fraud is proven." *Senese v. Climatemp, Inc.,* 222 Ill. App.3d 302, 164 Ill.Dec. 236, 244, 582 N.E.2d 1180, 1188 (1st Dist.1991). Thus, while the claim itself is superfluous, Fujisawa's allegation that a constructive trust is appropriate is not. Accordingly, while the claim is dismissed, it is understood Fujisawa may attempt to prove a constructive trust is an appropriate equitable remedy should it prevail on other claims.

### Conclusion

For the foregoing reasons, Dr. Kapoor's motion for summary judgment is granted on Fujisawa's constructive trust claim and, in part, on Fujisawa's common law fraud claim. Summary judgment is denied on Fujisawa's remaining claims.

---

**23.** Dr. Kapoor argues the breach of fiduciary duty claim is deficient because he was unaware of the ANDA fraud. As above, this argument fails.