903 So.2d 221 (2005)
Sharon J. COLLINSON, Appellant,
v.
Philip F. MILLER, III, and Gloria Miller Daigh, Appellees.
No. 2D03-2698.
District Court of Appeal of Florida, Second District.
April 13, 2005.
*222 John R. Blue and Robert E. Biasotti of Carlton Fields, P.A., St. Petersburg; and Cathy S. Reiman of Cummings & Lockwood, Naples, for Appellant.
Raymond T. Elligett, Jr., of Schropp, Buell & Elligett, P.A., Tampa; and Harold N. Hume, Jr., and J. Matthew Belcastro of Henderson, Franklin Starnes & Holt, P.A., Fort Myers, for Appellees.
ALTENBERND, Chief Judge.
Sharon J. Collinson appeals an order imposing a constructive trust on her homestead property in the principal amount of $568,650, plus prejudgment interest of $227,112. The constructive trust was imposed in favor of Philip F. Miller, III, and Gloria Miller Daigh, two of Mrs. Collinson's three step-siblings. The facts in this case recite like the worst nightmare of a law student preparing for a final exam in trusts and estates. The case presents close issues on the availability and application of constructive trusts, on the statute of wills, and on the scope of the "Deadman's Statute."[1] We have considered *223 these issues carefully. In the final analysis, however, we conclude that the action seeking a remedy of a constructive trust against the property in this case is barred by the statute of limitations.

I. THE FACTS
In 1972, Philip F. Miller, Jr., married Barbara Jenks Miller. At the time of their marriage, each of them had three adult children from prior marriages. Mr. Miller's children included Philip F. Miller, III, and Gloria Daigh, who were the plaintiffs in the trial court and are the appellees in this court. The third adult child of Mr. Miller has chosen not to participate in this litigation. Mrs. Collinson, the defendant in the trial court and the appellant in this court, was Mrs. Miller's daughter. Mrs. Miller had two other adult children who are not parties to this action.
In May 1976, Philip F. Miller, Jr., purchased two adjacent undeveloped waterfront lots on Boca Grande. In September 1976, Mr. Miller transferred ownership of the undeveloped lots from himself, individually, to his wife and himself, as tenants by the entireties. The evidence presented at trial established that Mr. Miller did so based upon his wife's explicit promise that upon her death she would bequeath the two properties to his children, subject to the children paying the estate taxes and administrative expenses associated with the devises. According to the appellees, Mr. Miller did this so that Mrs. Miller could enjoy the properties during her lifetime without his children having to pay any estate taxes upon his death. Mr. Miller was reportedly concerned that if the properties were not devised solely to his spouse, the estate taxes attributable to the properties might require his estate to sell the properties in order to pay the taxes.
The couple built a home on each lot. Until Mr. Miller's death in 1978, the couple lived in the "main house" and used the neighboring residence as a "guest house." When Mr. Miller died, his estate was valued at 3.4 million dollars. Mrs. Miller and Mr. Miller's son, Philip F. Miller, III, acted as co-personal representatives of the probate estate. Together, they executed the estate tax return which reflected that Mr. Miller's interest in the Boca Grande properties passed solely to Mrs. Miller, and thus this transfer avoided any estate tax that may have been imposed due to Mr. Miller's death. Mrs. Miller did not seek an elective share of this estate.[2] According to the testimony of Philip F. Miller, III, the estate of Mr. Miller passed primarily to the Miller children, and Mrs. Miller was not otherwise a beneficiary of the estate.
In 1982, Mrs. Miller, who continued to reside in the main house after Mr. Miller's death, contacted Mr. Miller's children and offered to sell them the guest house. In a letter dated March 24, 1982, Philip F. Miller, III, responded in pertinent part, "[I]t seems odd to me that you would offer us the opportunity to buy the house which was intended to be given to us in your will. (I realize that we will have to pay the estate taxes attributable to the houses)." Philip proposed Mrs. Miller gift the guest house to the children, subject to the children paying any gift tax attributable to the transaction.
On April 5, 1982, Mrs. Collinson's husband, writing on behalf of Mrs. Miller, responded to this proposal. He wrote:

*224 As it has been explained to me, [Mrs. Miller] intends to provide in her will that the houses (or a value equivalent thereto) net of the marginal estate tax rate will be for you and your sisters. Until that time, she will use the houses or dispose of the guest house or both houses and use the proceeds net of any taxes for her support including the purchase of another residence. If she elected to sell the house or houses, an amount, net of taxes would be carried forward to be distributed to you and your sisters net of applicable estate tax duties. . . .
I believe that [Mrs. Miller's] proposal to you was intended to give you and your sisters an opportunity to buy the house at its recently appraised value before she considers offering it to others. If you are not in a position to buy it, that is understandable. However, I am sure that you will also understand if she decides to sell the guest house now and use the income from the proceeds to help cover the costs of maintaining the main house and her other expenses.
At trial, Philip F. Miller, III, testified that this letter was inconsistent with the agreement between Mr. and Mrs. Miller to the extent it purported to allow Mrs. Miller to sell the properties. Nevertheless, after various negotiations, Philip F. Miller, III, purchased the guest house from Mrs. Miller in November 1983 for $450,000. Initially, as part of the transaction and for title insurance purposes, Philip's two sisters were asked to sign quitclaim deeds regarding any interest they may have in the guest house. Apparently this requirement was thereafter waived and the closing occurred. Although this transaction made it impossible for Mrs. Miller to devise the guest house to her stepchildren upon her death, neither she, Philip F. Miller, III, or the remaining Miller children memorialized any agreement or understanding describing the effect the transaction would have on Mrs. Miller's promise to her husband.
In 1990, Mrs. Miller decided to sell a remainder interest in the main home to her daughter, Mrs. Collinson. She sought the advice of an attorney and an accountant, both of whom advised her that in order to comply with federal tax laws, the transaction had to be commensurate to an arms-length transaction, based upon the fair market value of such a transfer. Mrs. Miller obtained three appraisals for the home. The accountant and attorney used the median appraisal, IRS life expectancy tables, and accepted accounting principles to calculate the fair market value of the remainder interest at $233,655. Mrs. Collinson agreed to purchase the remainder interest from Mrs. Miller for that amount, by paying $4000 at closing and executing a note and mortgage for the balance, with an interest rate of 8.35%, the market rate then promulgated by the IRS. This required Mrs. Collinson to pay Mrs. Miller $27,196.60 each year for fourteen years. Mrs. Collinson made eight annual payments and then prepaid the remaining balance in 1998. In the interim, in 1991, approximately a year after Mrs. Miller transferred the remainder interest to Mrs. Collinson, Mrs. Miller gave each of her three children a gift of $200,000.
In March 1999, Mrs. Miller died. Shortly thereafter, Mr. Miller's children first learned that she had conveyed a remainder interest in the main house to Mrs. Collinson and that Mrs. Collinson had become the sole owner of the home upon Mrs. Miller's death. Mrs. Collinson moved into the home and established it as her homestead property.
Mrs. Miller's will provided for her three stepchildren to receive a specific devise. Based upon notations on certain documents, *225 it appears Mrs. Miller calculated the amount of the devise by (1) taking the value of the main house in 1990, determined from the appraisals of the home at that time in conjunction with the transfer of the remainder interest of the property to Mrs. Collinson; (2) attributing certain capital gains and estate taxes to that amount and subtracting them from the value; and (3) dividing the remainder by three to determine each of the three Miller children's share. It appears that Mrs. Collinson's husband assisted Mrs. Miller in making these calculations, which suggests that Mrs. Collinson was aware that Mrs. Miller had expressed an intent to bequeath the property, or the equivalent of its after-tax fair market value, to Mr. Miller's children. Based upon the calculation, Mrs. Miller bequeathed the sum of $94,860 to each of her three stepchildren. When Mrs. Miller died nine years later, however, the fair market value of the main house had increased to $2,230,000.
Upon learning that Mrs. Miller had failed to devise the main house to them, Philip Miller, III, and Gloria Miller Daigh filed a claim with the estate of Mrs. Miller and then filed this action against the estate and Mrs. Collinson. The initial complaint was amended twice. Count one of the second amended complaint sought a constructive trust "for the benefit of the children of Philip F. Miller over the Real Estate or its equivalent value, net of estate taxes, which was wrongfully diverted to the daughter of Barbara Jenks Miller, and the estate of Barbara Jenks Miller."[3] Count two alleged Mrs. Miller tortiously interfered with Mr. Miller's estate and claimed that Mrs. Miller's estate was liable to the Miller children "for all damages resulting" from the tortious interference. Count three alleged that Mrs. Collinson tortiously interfered with an inheritance anticipated from the estate of Mrs. Miller. Although the only testimony at trial regarding the promise Mrs. Miller made to Mr. Miller established that Mrs. Miller specifically promised to transfer the two pieces of property to the Miller children, and that this did not permit the sale of the properties during Mrs. Miller's lifetime, the second amended complaint alleged that Mrs. Miller promised "that she would hold the Real Estate for the benefit of Philip F. Miller's children, and that upon her death they would receive the Real Estate or its equivalent value, net of estate taxes."
At some point, Mr. Miller's children settled their claim against the estate. At the trial in this matter, Mrs. Collinson sought to admit into evidence the settlement agreement between Mr. Miller's children and the estate, but Mr. Miller's children successfully objected to this evidence, and therefore this court has no record of the terms of that settlement. The Miller children withdrew counts two and three of the second amended complaint. The action proceeded to trial solely against Mrs. Collinson on the count for constructive trust. Although there was some evidence regarding the guest house, the Miller children's claims at trial focused exclusively on the main house.[4]
*226 After considering the evidence, the trial court granted the Miller children's request for a constructive trust against the property purchased by Mrs. Collinson for that portion of the Miller children's claim related to the value of that home. The constructive trust was imposed in the amount of $568,650, representing $284,325 each for the two plaintiffs.[5] The trial court also awarded the plaintiffs $227,112 in prejudgment interest. Thus Mrs. Collinson's property is now subject to an equitable lien of $795,762. The trial court denied Mrs. Collinson's motion to offset the award by the amount each child received as a specific bequest from Mrs. Miller.

II. THE DISTRACTIONS
There are several factual aspects and legal issues associated with this case that complicate the analysis. Although these issues do not affect our final analysis, they highlight the problems inherent in the application of the ill-defined remedy of a constructive trust.
First, Mr. Miller's children are trying to enforce an oral agreement between their father and Mrs. Miller that was specifically designed and intended to evade estate taxes. If this agreement had been reduced to writing, it is virtually certain that estate taxes would have been lawfully imposed at the time of Mr. Miller's death. This is because the agreement would have resulted in the transfer of only a life estate to Mrs. Miller, with a remainder interest to the Miller children. Because Mr. Miller had a sizeable estate, that remainder interest would have been subject to estate taxes. Philip Miller, III, as co-personal representative of his father's estate, filed an estate tax return which represented that this real property was devised to Mrs. Miller in fee simple. As a beneficiary of his father's estate, Philip Miller, III, received benefits due to the tax deferral that resulted. It seems odd, to say the least, that a court of equity would impose a constructive trust in favor of the Miller children, and particularly Philip, against a third party, to enforce an oral agreement specifically designed to evade taxes. If the constructive trust were upheld, it appears the Miller children would successfully obtain this property without paying the federal taxes due and owing based upon the agreement they sought to enforce.
Second, the Miller children's failure or refusal to enforce this agreement at the time of Mr. Miller's death in 1978 may have had other far-reaching and irrevocable consequences in addition to the avoidance of taxes. If the Miller children had pursued the enforcement of this agreement at the time of Mr. Miller's death and Mrs. Miller had repudiated the agreement, one wonders what remedy the children would have had. The property that Phillip F. Miller, III, bought from Mrs. Miller in 1983 almost certainly would have been sold upon Mr. Miller's death to pay the estate taxes that would have been required by such an agreement. In 1978, even if the main home were not titled in Mrs. Miller's name, it was her homestead and thus she remained entitled to a life estate in the property. See art. X, § 4, Fla. Const.; §§ 732.401, .4015, Fla. Stat. (1977). Mrs. Miller also could have demanded an elective share equal to thirty percent of the fair market value of all property subject *227 to administration. See §§ 732.201,.206, .207, Fla. Stat. (1977). If Mrs. Miller had repudiated the agreement at the time of Mr. Miller's death, presumably the children would not have been able to receive the benefit of the agreement without the negative tax consequences and the resulting changes in the probate of their father's estate that would flow from the decision to enforce the agreement. Thus, it seems odd that twenty years later, Mr. Miller's children would have an improved claim based upon this tax avoidance scheme against Mrs. Miller's daughter who purchased the property in a method designed to comply with all tax laws.
Third, if this constructive trust theory is valid, then it would seem that Phillip Miller, III's two siblings should have a comparable claim against him based upon the value of the guest house that he purchased from Mrs. Miller. Phillip Miller, III, knew of the oral agreement at issue here, but purchased the property from Mrs. Miller anyway, to the exclusion of his two siblings. This is the exact same factual scenario alleged regarding the claim against Mrs. Collinson. If the guest house has appreciated in value to the same extent as the adjoining main house, Philip's interest in the guest house could also be subject to a substantial constructive trust in favor of his siblings.
Finally, the role of Mrs. Miller's probate estate in this action, and the effect of any settlement the Miller children made with the personal representative of the estate, is unclear. The Miller children seek redress for a violation of a promise made and broken by Mrs. Miller. The record does not disclose whether Mrs. Miller's estate could have satisfied the amount due to the Miller children as established in this action without resorting to a constructive trust on Mrs. Collinson's property, although the record suggests Mrs. Miller's estate may have contained as much as $6,000,000. It is not clear why the Miller children, having settled their claim against the estatea claim which presumably included the cause of action for constructive trust alleged against the estate in the second amended complaintwere permitted to continue to pursue the claim for constructive trust against Mrs. Collinson. The trial court denied Mrs. Collinson's request to offset the amount imposed as a constructive trust with the funds received by the Miller children from the estate, without having even reviewed the settlement. Permitting a constructive trust against property outside the probate estate effectively means the Miller children's claim, unlike the claim of other creditors of the estate, becomes one secured by property of a third party. If this property could not be recovered by Mrs. Miller's estate for the benefit of her creditors, it is not clear what legal authority would allow a segment of those creditors to use a constructive trust to obtain the property from a third-party purchaser.
Thankfully, we are not called upon to conclusively resolve all issues a law student might identify in a review of this case or to reconcile the law on these various issues. Instead, we must narrow our focus to the dispositive issue presented in this case and decide that issue in a manner consistent with precedent and the appropriate legal principles.
In this appeal, the parties have identified three issues, each containing various subissues: (1) whether the action was barred by the statute of limitations or the probate code; (2) whether the trial court erred in imposing a constructive trust; and (3) whether the trial court erred in imposing an equitable lien on homestead property. We conclude that the remedy of constructive trust was foreclosed because any cause of action regarding Mrs. Miller's breach of her promise to devise this specific *228 property to the Miller children is barred by the statute of limitations.

III. THE NATURE OF CONSTRUCTIVE TRUST
As explained above, Philip F. Miller, III, and Gloria Miller Daigh's second amended complaint was divided into three counts. The count which was the subject of the trial was entitled an action for constructive trust. A constructive trust, however, is not a traditional cause of action; it is more accurately defined as an equitable remedy. See Bauman v. Rayburn, 878 So.2d 1273, 1275 n. 1 (Fla. 5th DCA 2004); see also Fujisawa Pharm. Co. v. Kapoor, 16 F.Supp.2d 941, 952 (N.D.Ill.1998); Radenhausen v. Doss, 819 So.2d 616, 620 (Ala.2001); Robbins v. Payne, 55 S.W.3d 740, 750 (Tex.Ct.App.2001).
We recognize that some cases have treated constructive trust in a manner similar to a cause of action, by discussing the "elements" of such a claim and even treating such a claim for constructive trust as subject to dismissal for failure to state a cause of action. See, e.g., Abele v. Sawyer, 747 So.2d 415, 416 (Fla. 4th DCA 1999). In part, this may be because the remedy developed in equity at common law and the exact parameters for its use have never been clear. Justice Cardozo stated, "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest equity converts him into a trustee." Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 122 N.E. 378, 380 (1919). He added, "A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief." Id. at 381; see also Latham v. Father Divine, 299 N.Y. 22, 85 N.E.2d 168, 170 (1949) (stating, "A constructive trust will be erected whenever necessary to satisfy the demands of justice" and that the applicability of constructive trust "is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them"); George Gleason Bogert & George Taylor Bogert, The Law of Trusts & Trustees, vol. 6, ch. 24, § 471, p. 29 (Rev.2d ed. West 1978) (stating regarding constructive trusts, "The court does not restrict itself by describing all the specific forms of inequitable holding which will move it to grant relief, but rather reserves freedom to apply this remedy to whatever knavery human ingenuity can invent").
Although constructive trusts may be an effective and appropriate solution in some cases to redress "human knavery," the remedy remains an extraordinary one. Certainly, courts should be hesitant to employ such an equitable remedy to permit recovery where an action at law would prohibit recovery, where the remedy would permit or reward a violation of other laws, or where the remedy would undermine other legislative policies. Ultimately, it is the fact that a constructive trust is an equitable remedynot a cause of actionthat has engendered much of the confusion in this case. Because a constructive trust is a remedy, it must be imposed based upon an established cause of action.

IV. THE STATUTE OF LIMITATIONS
Here, the gravamen of the Miller children's claim is that Mrs. Miller breached an oral contract to make a will or give a specific devise.[6] According to the Miller *229 children, that promise specifically required Mrs. Miller to devise to the Miller children the main house at issue in this litigation and the guest house. It is undisputed, however, that in 1982 or 1983, Mrs. Miller unequivocally made clear her intention to sell the guest house and to retain the right to dispose of the main house, irrespective of any promise she made to Mr. Miller. There is also no question that Philip Miller, III, and his two sisters became aware of this breach, primarily through the sale of the guest house to Philip at its fair market value.
Regardless of how one characterizes the Miller children's cause of action, whether as one founded on fraud or on contract, the cause of action accrued in 1982 or 1983 when the Miller children were specifically placed on notice that Mrs. Miller did not intend to abide by the terms of the agreement as it related to maintaining the specific properties for them and in fact violated the agreement by selling the beach house. The very essence of the remedy of constructive trust is the identification of specific property or funds as the res upon which the trust may be attached. Blue Cross Health Servs., Inc. v. Sauer, 800 S.W.2d 72, 76 (Mo.App.1990). Here, the Miller children sought to specifically impress a piece of property with a constructive trust based upon a promise made by Mrs. Miller in 1976 regarding that property, but specifically repudiated by her in 1982 or 1983. Any cause of action seeking to impress that property with a constructive trust based upon that promise accrued in 1982 or 1983. When the cause of action accrued, the Miller children had four years to bring a claim based upon that breach against Mrs. Miller. See § 95.11(3), Fla. Stat. (1981). This action, which was not filed until 1999 and sought recovery of the property from Mrs. Collinson, was barred by the statute of limitations.
We recognize that the Miller children may have been lulled into inaction in 1983 because Mrs. Miller indicated her intention to provide them with a specific bequest in lieu of a devise of the real property. By permitting the sale and purchase of the guest house, the Miller children acceded to Mrs. Miller's modification of her promise. It is possible that the Miller children retained some cause of action against Mrs. Miller personally (or her estate) based upon her representations at that time. See, e.g., Tensfeldt v. Tensfeldt (In re Estate of Tensfeldt), 839 So.2d 720 (Fla. 2d DCA 2003) (holding breach of a contract requiring the promisor to make a will or devise does not accrue until the death of *230 the promisor, absent clear repudiation of that promise); W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc., 728 So.2d 297, 302 (Fla. 1st DCA 1999) (identifying the elements of promissory estoppel). They did not, however, retain an action premised specifically upon the real property involved in the initial promise.
Further, the Miller children did not retain a cause of action that could be pursued against Mrs. Collinson instead of Mrs. Miller. Even if an action related specifically to the real property was not barred by the statute of limitations, it is difficult to see how the Miller children could enforce Mrs. Miller's subsequent promise to provide them the properties or the equivalent of their value against property conveyed to Mrs. Collinson. If Mrs. Miller had a choice to leave either the properties or their equivalent value, the conveyance of the main house to Mrs. Collinson was not itself a breach of the promise. In light of the alternatives provided to Mrs. Miller under this scenario, it appears the Miller children would be required to first pursue a claim against Mrs. Miller's estate for the equivalent value of the properties before asserting a claim against Mrs. Collinson. In addition, it is difficult to see how Mrs. Collinson would be complicit in the breach of such an agreement unless she knew not only that her mother refused to devise the property to the Miller children, but also that her mother would refuse to devise the equivalent value of the properties upon her death or that her mother's estate would be unable to pay an appropriate claim.
Here, the plaintiffs sought an equitable remedy of constructive trust which requires a claim to the specific property upon which the trust is sought to be imposed. The plaintiffs established that Mrs. Miller specifically promised to convey that property to them in order to induce Mr. Miller to transfer an interest in the property to Mrs. Miller. The undisputed evidence also showed, however, that Mrs. Miller repudiated that promise in 1982 or 1983. Any cause of action seeking the remedy of constructive trust on that property accrued at that time. Any other remedy for Mrs. Miller's malfeasance had to be directed to her estate, not to third parties. We therefore reverse the judgment awarding Philip Miller, III, and Gloria Miller Daigh a constructive trust on the property owned by Sharon Collinson.
Reversed.
SILBERMAN, J., and LEVENS, WILLIAM P., Associate Judge, Concur.
NOTES
[1] See § 90.602, Fla. Stat. (2003).
[2] There is no evidence in our record that any agreement existed between Mr. and Mrs. Miller that would have limited Mrs. Miller's rights as a surviving spouse upon Mr. Miller's death.
[3] The complaint defined "Real Estate" to include both the main house and the guest house.
[4] At a hearing held after the trial on Mrs. Collinson's motion for rehearing, the attorney for the Miller children represented to the court that the Miller children had settled their claim against the estate for the amount of the specific devise Mrs. Miller provided to them in her will, with the intent "to resolve the claim related to the guest house." There is nothing in our record to verify that representation. This also leaves unclear whether the settlement resolved the claims against the estate regarding the transfer of the main house, and if it did, how that settlement would affect any future judgment against Mrs. Collinson based upon that same claim.
[5] This figure was based upon a finding that the main home had a fair market value of $2,230,000 at the time of Mrs. Miller's death, and the testimony of a certified public accountant who opined that, based upon this value, after taking into account expenses associated with the sale of the property and taxes resulting from a transfer to the Miller children, each child would be entitled to $284,325. No provision was made for the third Miller child who elected not to participate in this action.
[6] Presumably, the Miller children framed this count as one of constructive trust and not as a breach of an agreement to make a will or give a specific devise because the statute of wills would generally preclude an action to enforce an oral agreement to make a will or devise. See § 732.701(1), Fla. Stat. (1977) (stating, "No agreement to make a will, to give a devise, not to revoke a will, not to revoke a devise, not to make a will, or not to make a devise shall be binding or enforceable unless the agreement is in writing and signed by the agreeing party in the presence of two attesting witnesses"); see also First Gulf Beach Bank & Trust Co. v. Grubaugh, 330 So.2d 205 (Fla. 2d DCA 1976). In other jurisdictions, however, it appears well-established in common law that a constructive trust can be imposed as a remedy for a breach of an oral agreement to make a devise, notwithstanding an otherwise applicable statute of wills. See Starzec v. Kida, 183 Conn. 41, 438 A.2d 1157, 1160 n. 2 (1981); Bengoechea v. Bengoechea, 106 Idaho 188, 677 P.2d 501, 506 n. 2 (Idaho Ct.App.1984); Voelkel v. Tohulka, 236 Ind. 588, 141 N.E.2d 344, 349 (1957); Bastien v. Bastien, 84 A.D.2d 800, 444 N.Y.S.2d 156, 156 (N.Y.App.Div.1981); Leigh v. Weiner, 679 S.W.2d 46, 48 (Tex.Ct.App.1984). We have found no Florida cases on this issue. We need not decide this issue in this case. We note, however, that imposing a constructive trust in violation of the statute of wills in a case such as this one results in violating many of the purposes and policies underlying that legislative provision.